BRAY *v.* TIMMS.

Opinion delivered January 28, 1924.

1.  TRUSTS—EXPRESS TRUST—PAROL EVIDENCE.—Even if parol evidence were competent, under Crawford & Moses' Dig., § 4867, to establish an express trust in an oil and gas lease, the evidence herein was insufficient for that purpose.

2.  TRUSTS—CONSTRUCTIVE TRUST.—Though evidence is inadmissible to establish an express trust, under Crawford & Moses' Dig., § 4867, it is competent under § 4868, *Id.,* to establish a resulting or a constructive trust.

3.  TRUSTS—CREATION OF TRUST EX MALEFICIO.—Trusts *ex maleficio* will be declared whenever the legal title of property, real or personal, has been obtained through actual fraud, misrepresentation, concealment, or other undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means or under any other similar circumstances, which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest.

4. TRUSTS—SUFFICIENCY OF PAROL EVIDENCE.—While trusts resulting by operation of law may be proved by parol evidence, such evidence will be received with great caution, and must be full, free and convincing.

5. TRUSTS—DEED ABSOLUTE IN FORM—EVIDENCE.—In the case of a deed absolute in form there is a strong presumption against the existence of a trust, which must be overcome by a greater weight of evidence than a mere preponderance.

6. TRUSTS—SUFFICIENCY OF EVIDENCE.—In a suit to establish a trust *ex maleficio* in an oil and gas lease, evidence *held* insufficient to establish same.

Appeal from Union Chancery Court; *J. Y. Stevens*, Chancellor; reversed.

*John C. Leopard & Son, Randolph & Randolph* and *Marsh & Marlin*, for appellant.

If any trust relation existed between Koch and Timms, it existed because of an express agreement or contract, and was an express trust. It could not have been a resulting trust, because no part of the consideration paid for the deeds of conveyance was paid by Timms. Crawford & Moses' Digest, § 4876. Parol evidence will not be heard to engraft an express trust upon a deed absolute in form. 103 Ark. 273; 104 Ark. 32; 110 Ark. 389; 100 Ark. 253. There is no implied trust relation existing between these parties, in respect to the royalty interest, neither can it be contended that a trust *ex maleficio* was created, since there is nothing in the record that raises even a suspicion that Koch practiced any fraud upon Timms. 113 Ark. 36; 73 Ark. 310. Appellee is estopped by the deed executed August 3, 1920, to Koch, as well as by his own conduct in holding his own assignment of same off the record, and procuring the conveyance to be made direct from Dail to Koch, and accepting the consideration from Koch that was paid for this one-half royalty described in the deeds. 10 R. C. L. 677; 8 Ark. 345. The testimony, even if parol evidence were admissible to establish a trust relationship here, does not meet the requirements of the law to the effect that such evidence must be full, clear and convincing. 89 Ark. 183; 11 Ark. 82; 19 Ark. 365; 44 Ark. 365; 45 Ark.

481; 48 Ark. 169; 64 Ark. 115; 1 Perry on Trusts, par. 137; 114 Ark. 128; 70 Ark. 145, 66 S. W. 658; 101 Ark. 451, 142 S. W. 848; 73 Ark. 313, 83 S W. 910; 3 Pomeroy, Eq. Jur., § 1056; 145 Ark. 161. See also 20 R. C. L. 1251, par. 98; 111 Ark. 45; 109 Ark. 335.

*Mahony, Yocum & Saye* and *McClintock, Quant & Ferguson,* for appellee.

1. A deed once executed and delivered cannot be revoked, nor the title reconveyed by cancellation or destruction of such. Devlin on Deeds, 3d ed., § 300; 8 R. C. L., § 70; 124 Va. 736; 92 Mo. 532; 166 Ind. 471; 225 Mass. 531; 44 N. D. 114; 107 Wash. 523; 188 Ky. 832; 242 S. W. (Ky.) 15; *Id.* 853; 21 Ark. 80; 34 Ark. 503; 52 Ark. 493; 53 Ark. 509; 60 Ark. 8; 108 Ark. 491; 245 S. W. (Ark.) 41.

2. A purchaser of land with notice of an unrecorded, delivered deed acquires no title, and purchases subject thereto, dependent upon the terms of the unrecorded conveyance. 14 Ark. 286; 48 Ark. 277; 57 Ark. 508-9; 77 Ark. 309; 95 Ark. 582; 108 Ark. 490; 127 Ark. 618; 132 Ark. 158; 135 Ark. 206; 138 Ark. 215; 238 S. W. (Ark.) 19.

3. The deed from Timms to Koch, dated August 3, 1920, never having been delivered, was void, and conveyed no interest in the Garrett Royalty. 14 Ark. 286; 24 Ark. 244; 74 Ark. 104; 77 Ark. 89; 80 Ark. 8; 97 Ark. 283; 98 Ark. 466; 100 Ark. 427; 123 Ark. 601; 132 Ark. 438; 140 Ark. 579; 142 Ark. 311.

4. The appellant cannot, on appeal, raise issues or defenses or present theories of the case for which he did not contend in the trial court. 74 Ark. 88; 74 Ark. 557; *Id.* 312; 81 Ark. 549; 82 Ark. 260; 83 Ark. 575; 101 Ark. 95; 108 Ark. 490; 131 Ark. 382; 132 Ark. 458; 149 Ark. 142.

5. Timms, while holding the legal title to the Garrett royalty by deed from Dail, with intent to convey part thereof for value, caused Dail to execute subsequent deed therefor to Koch, who transferred to Bray with notice. Timms, therefore, still holds the legal title to

the Garrett royalty, in part for himself, and in part as trustee for Bray, to the extent only of Bray's actual equitable interest in such royalty. 7 N. D. 335, 47 L. R. A. 637.

6. While clear and convincing proof of a resulting or constructive trust is required, it is not essential that such proof be undisputed. 246 S. W. (Ark.) 499.

7. If one purchases land with notice of a trust, he takes it impressed with such trust. 137 Ark. 14, 207 S. W. 436.

8. There are, in this country, two kinds of enforceable parol trusts: first, resulting trusts, and, second, constructive trusts. 100 Ark. 253.

9. An oral agreement between A and B that B shall purchase certain property, taking title in his own name, A furnishing part of the consideration, and B the remainder, and that A should have a definite interest in the property by reason of having furnished a specific portion of the consideration, does not fall within the statute of frauds. It is a resulting trust, and enforceable. Pomeroy, Eq. Jur., 4th ed., § 1038; 9 Ark. 518; 19 Ark. 39; 20 Ark. 272; 27 Ark. 77; 29 Ark. 612; 35 Ark. 548; 40 Ark. 62; 42 Ark. 503; 45 Ark. 481; 64 Ark. 155; 70 Ark. 145; 79 Ark. 69; 81 Ark. 478; 105 Ark. 318; 114 Ark. 128; 118 Ark. 146; 132 Ark. 402; 243 S. W. (Ark.) 811.

10. Where one in the course of a fiduciary or confidential relationship purchases real property for the benefit of the party toward whom he holds that relationship, he cannot, by taking title thereto in his own name, claim the property to the exclusion of the other. Equity would hold such a person as a constructive trustee. Pomeroy, Eq. Jur., 4th ed., § 1053; 19 Ark. 39; 20 Ark. 222; Id. 381; 26 Ark. 344; 39 Ark. 309; 73 Ark. 310; 101 Ark. 451; 103 Ark. 273; 113 Ark. 36; 136 Ark. 481; 151 Ark. 305.

Wood, J. On the 18th of October, 1920, George B. Koch and wife executed and delivered to Rolla Bray the following deed:

"Know all men by these presents: That whereas, R. R. Garrett and Martha J. Garrett, his wife, did on the 5th day of June, 1919, execute and deliver to H. H. Neihaus, a trustee, a certain oil, gas and mineral lease on a tract of real estate then owned by them in Union County, State of Arkansas, described as 'the S½ of the NW¼ of section 4, township 19, range 15, containing 80 acres, more or less, which said lease is recorded in book 74 at page 164 of the deed records of said county; and

"Whereas, on the 5th day of February, 1920, said R. R. Garrett and Martha J. Garrett, his wife, still the owners of said real estate, did execute, acknowledge and deliver to H. L. Dail of Union County, State of Arkansas, their deed of conveyance, transferring and conveying to said H. L. Dail an undivided one-half interest in and to all the oil, gas and other minerals in, under and upon said real estate, subject to the aforesaid lease, and an undivided one-half interest in and to all royalties reserved by virtue of said lease, together with other rights and interests, which said deed of conveyance was recorded on the 5th day of February, 1920, in book 85, at page 90 of the deed records of said county;

"Now therefore, George B. Koch, the undersigned, of Jamesport, in Daviess County, Missouri, for and in consideration of the sum of five thousand dollars in cash and a note of $2,500, issued by the said George B. Koch to L. W. Timms, the cash paid and note delivered by Rolla Bray of Daviess County, State of Missouri, the receipt of which is hereby acknowledged, does hereby sell, assign, transfer, set over, and convey unto the said Rolla Bray and unto his heirs and assigns forever all of his right, title and interest, as obtained aforesaid, to and under the said deed of conveyance made, executed and delivered aforesaid to him by H. L. Dail on the 7th day of May, 1920, and recorded in deed records 89 at page 296 of the deed records of Union County, in the State of Arkansas, conveying the oil royalties and all oil interests conveyed to him on the S½ of the NW¼ of section 4, township 19. range 15, containing 80 acres, more or less, as shown by

lease records in book 74 at page 164 of the deed records of said county.

"To have and to hold the same unto the said Rolla Bray and unto his heirs and assigns forever, under the terms and conditions as in said deed of conveyance contained.

"In testimony whereof I have hereunto set my hand this the 18th day of October, 1921.

"George B. Koch,

"Anna Koch."

This action was instituted by Lewis W. Timms, the appellee (hereafter called Timms), and Harvey C. McClary against Rolla Bray, appellant (hereafter called Bray), to have a trust declared in favor of Timms to a four-sixths interest in the royalties conveyed to Bray by the above instrument. McClary afterwards dismissed his complaint, and he passes out. The interest conveyed by the deed is referred to throughout the record as the "Garrett royalty," and will hereafter be called the "Garrett royalty."

Timms alleges in his amended complaint that Bray holds the Garrett royalty, the same being a one-sixteenth interest in all the oil, gas and other minerals produced upon the land, in the proportion of four-sixths thereof for Timms and two-sixths for Bray; Bray denies this, and alleges that he owns the entire interest in the royalty conveyed to him by the deed.

R. R. Garrett and wife were the owners of eighty acres of land in Union County, Arkansas, and in 1919 they executed an oil and gas lease in usual form to one H. H. Neihaus, trustee, reserving to themselves one-eighth of the oil, gas and other minerals produced on said land. In addition to the above deed from Koch to Bray, the record contains the following documentary evidence:

On February 5, 1920, Garrett and wife conveyed to H. L. Dail an undivided one-half interest in the oil, gas and other minerals in, under and upon the lands described, subject to the Neihaus lease, and also an undivided one-half of the royalty they were to receive under

the lease. This instrument was duly recorded on the day of its execution. On the back of the deed was indorsed an assignment from Dail to Timms of all Dail's interest conveyed by the deed. This assignment was dated February 27, 1920. The assignment was never recorded. On the 7th of May, 1920, Dail conveyed to George B. Koch, by deed absolute in form, the royalty which had been conveyed to him by Garrett, which deed was duly recorded May 20, 1920.

On the 3rd of August, 1920, Timms executed a deed absolute on its face, which, after reciting the former conveyances of the royalty from Garrett and wife to Dail and from Dail to Timms, purports to convey all the right, title and interest of Timms in the royalty to Koch. This deed was duly acknowledged on the day of its execution, but was never recorded. On the 12th of October, 1921, George B. Koch, Lewis Marlow and Gus Lent, parties of the first part, and Rolla Bray, party of the second part, entered into a "contract of sale" as follows:

"That the parties of the first part have this day sold to the party of the second part all their right and interest in a certain royalty executed by R. R. Garrett and Martha J. Garrett, his wife, by their instrument in writing executed on the 5th day of February, 1920, on the south half of the northwest quarter of section 4, township 19, range 15, Union County, in the State of Arkansas, and said instrument recorded in book 85, at page 90, in the records of Union County, said title of the parties of the first part obtained through a conveyance made by L. W. Timms to the said George B. Koch and his heirs and assigns forever, and on the 3rd day of August, 1920, which conveyance recites that whereas, on the 5th day of February, 1920, said R. R. Garrett and Martha J. Garrett, his wife, while still the owners of said real estate, did execute, acknowledge and deliver to H. L. Dail of Union County, State of Arkansas, their deed of conveyance, transfer and convey to the said H. C. Dail an undivided one-half interest in and to all the oil, gas and other minerals in and upon said real estate, subject to the

aforesaid lease, and an undivided one-half interest in and to all royalties reserved by said Garrett and wife, under and by virtue of said lease, together with other rights and interests, which said deed of conveyance was recorded on the 5th day of February, 1920, in book 85, page 90, of the deed records of said county, and the said H. L. Dail assigned the said property to L. W. Timms of Kansas City; and the L. W. Timms of Jackson County, in the State of Missouri, for the consideration of $1 and other valuable considerations, to him cash in hand paid by G. B. Koch of Daviess County, Missouri, did hereby sell, transfer, assign and set over and convey to the said George B. Koch and his heirs and assigns forever all his right, title and interest in and to and under the said deed of conveyance made, executed and delivered, as set forth to him by R. R. Garrett and Martha J. Garrett, his wife, on February 5, 1920, and recorded as aforesaid in book 85, at page 90, of the deed records of Union County, State of Arkansas, which said deed of assignment was executed by the said L. W. Timms, the interest as conveyed in said deed to be conveyed to the said Rolla Bray; and it is further contracted and agreed that whatever title the said first parties acquired heretofore under said deed of assignment from L. W. Timms shall be assigned and conveyed to the said Rolla Bray, by whatever conveyance necessary to properly assign said interest.

"It is further agreed that the said Rolla Bray shall pay $1,000 as earnest money to bind this contract, and within thirty days shall pay the balance as follows: $4,000 in cash, and deliver a note executed by George B. Koch to L. W. Timms, consideration $2,500, now held by F. C. Smith, as a part of the purchase price of the royalty herein sold to Rolla Bray."

On the 15th of October, 1921, H. L. Dail and his wife, Josephine Dail, executed a deed absolute in form, conveying to George B. Koch all of their interest in the royalty in controversy.

Besides the above documentary evidence, there is a vast volume of oral testimony which we have carefully considered.

Timms alleged, and he adduced testimony which tended to prove, that he and Dail were partners in the business of dealing in oil, gas and mineral leases and royalties until about the 23rd of February, 1920; that the Garrett royalty was conveyed by Garrett to Dail and by Dail to him; that he sold a one-half interest in this royalty to Koch, Marlow and Lent; that the consideration paid by them for this half interest was $7,500, and they were to divide it equally between them in the proportion of one-sixth each, for which each was to pay the sum of $2,500; that Koch executed his note for that sum, and Marlow and Lent paid for their respective interests in cash; that it was agreed between them that the entire title should appear in Koch, and that he should hold the same in trust for himself and the others according to their respective interests; that accordingly Timms, who owned the royalty, had Dail, in whom the record title yet appeared, to convey the title directly to Koch, and told Dail to make Koch trustee in the deed, but he failed to do so, and that Timms at the same time also delivered to Koch the deed which had been executed to him by Dail, but which had not been recorded; that it was understood between them that. in pursuance of the agreement that the record title should appear in Koch, a declaration of trust was prepared, covering the Garrett royalty and showing the respective interests of the four parties; that these four parties agreed to syndicate their interests under a common-law trust and subdivide the same into units to the amount of $50,000; that they would sell these units and issue certificates of interest signed by Koch, as trustee, until a sum was realized sufficient to reimburse themselves in proportion to the sums each had invested, and the residue of the royalty unsold was to be owned by them in proportion to their respective interests. However, before the trust was actually executed or any interest sold under it, this scheme was abandoned. The declaration of trust was never recorded, and the absolute record title remained in Koch.

Timms further alleged that Bray knew all of the above facts, and that Koch, Marlow and Lent held their interest in the royalty six months or more; that Timms and Bray entered into an agreement to purchase the interest of Koch, Marlow and Lent in the royalty, and that, after prolonged negotiations, the deal was consummated, by the terms of which he surrendered to Koch his promissory note for $2,500 as the consideration for the purchase of Koch's one-sixth interest, and that Bray paid to Marlow and Lent $5,000 for the purchase of their respective interests, and that one Harvey C. McClary had contributed $700 of the amount necessary for the purchase of the interest of Marlow and Lent.

Timms testified that Bray was advised, in the presence of Scott Miller, that Koch held the title to the Garrett royalty in trust for Timms and for Marlow, Koch and Lent; that he had told Bray of the interest that Koch, Marlow and Lent had in the Garrett royalty perhaps a dozen times before the 5th of October, 1921. He further testified that he had delivered to Koch the deed from Dail to Timms when he sold Koch an interest in the Garrett royalty, and he never saw it afterwards in Bray's hands, except that it was read to witness and Bray in Miller's office. On several occasions Bray was advised of the unexecuted declaration of trust; that about the first of October, 1921, Bray and Timms met in Scott Miller's office, where Bray was told of the deed of the Garrett royalty to Dail and that such deed was in the hands of Koch. Timms also testified that he informed Bray of the deed executed by Dail to him, which had not been recorded, prior to October 12, 1921, when the contract for the sale of the Garrett royalty between Koch, Marlow, Lent and Bray was entered into. Timms testified that he and Bray had handled other stuff together; at one time had bought a farm in Kansas for which Timms paid two-thirds and Bray paid one-third. Title was taken in Timms, and Timms afterwards executed to Bray a deed for his interest. He also testified to other facts showing that their business relations had been close and intimate;

that when they went on the first trip to El Dorado to examine the royalty, after the contract was entered into to purchase the interest of Koch, Marlow and Lent, they went together on the train, sharing equally the expenses of the trip, and that they always divided the expenses.

Scott J. Miller testified that he was the attorney for Koch, Marlow and Lent in the transaction for the sale of their interest in the Garrett royalty. His testimony is to the effect that, after Bray and Timms had concluded their negotiations with each other and with Koch, Marlow and Lent, looking to the purchase of their interests, these negotiations were evidenced by a written contract, which witness drew. Judge Alexander was the attorney representing Bray. A thousand dollars was paid down by Bray before the contract was finally completed. The balance of $4,000 was to be paid when Koch's note for $2,500 to Timms was returned and the $4,000 balance paid. Witness had sent the deed for Koch and his wife to execute. This deed is the same as that set out above of date October 18, 1921, except that the deed which he had prepared and Koch had executed had in it, at the end of the paragraph last preceding the paragraph "to have and to hold," the following: "This deed only conveys the interest of George B. Koch, Lewis Marlow and Gus Lent." At the suggestion of Koch this paragraph was inserted because otherwise it might be considered he was transferring title to all the Garrett royalty. The deed with this paragraph inserted was tendered to Bray, and witness told Bray that he didn't want him to accept it without knowing that the paragraph had been inserted. Bray submitted the deed to his attorney, Judge Alexander, and Bray and Alexander both objected to the inserted paragraph. Witness then insisted with Koch that it was in the contract that it should not be written in there; that the deed fully explained what he was deeding. Then the inserted paragraph was crossed out. and the deed was delivered to Bray, and likewise the deed from Dail to Koch, with the assurance that they would have nothing

further to do with it. Bray asked about the abstract, and was informed that Timms had it.

Witness further testified that, at the time arranged for the closing of the transaction in witness' office, Bray and Timms were present. He stated that something was said as to Timms' interest, and that Bray fully understood that Koch only owned or controlled a one-half of the Garrett royalty; that this was all that Koch owned, and in his deed he transferrred only the interest he had, representing himself, Lent and Marlow. Witness further testified that he told Bray, at the time he paid the remaining $4,000 and delivered to Koch his note for $2,500, that Koch, Marlow and Lent owned three-sixths of the Garrett royalty and that the other three-sixths belonged to Timms. Witness knew personally that a declaration of trust had been prepared, and had told them, prior to the closing of the transaction, in the presence of Bray, that the declaration of trust had not been executed, but that Koch held the title to the royalty as trustee, and only owned or controlled a half interest of the royalty for himself, Marlow and Lent. Witness didn't remember Bray's words exactly in answer to this statement, but did remember that Bray said that he was simply buying the interest of Marlow and Lent, his clients, and witness explained what their interests were. Witness also stated that George B. Koch had not executed a trust, and therefore the title being in him (Koch), any transfer by Koch would transfer the title that was put in Koch, and the parties' interest in the result would remain the same.

Other witnesses, attorneys representing Timms, testified that, in conferences had between Timms and Bray, at which Leopard, who is now Bray's attorney, was present, looking to the purchase of the Garrett royalty from Koch, Marlow and Lent, Bray and Timms seemed to be conversant with the facts as to the ownership of the Garrett royalty, and the explanation of each in those conferences was to the effect that Timms originally had

title which he acquired from Dail, and that he sold a half interest to Koch, Marlow and Lent, or a one-sixth to each of them, for the sum of $2,500, each, and that Timms and Bray were negotiating for the repurchase of this interest of Koch, Marlow and Lent upon the terms as stated by Timms and Miller. In other words, these witnesses corroborated the testimony of Miller and Timms to the effect that Timms had title to the Garrett royalty which he had acquired from Dail, and that he had sold a half to Marlow, Koch and Lent, and that, if the arrangements between Timms and Bray for the purchase of the Koch, Marlow and Lent interests were carried out, Timms would own four-sixths and Bray would own two-sixths of the Garrett royalty.

The testimony of Koch, Marlow and Lent was to the effect that they purchased of Timms a half interest of the Garrett royalty—that is, a half of one-sixteenth of production. The conveyance was made to Koch by Dail for the Garrett royalty, and Koch was to hold the interest of Marlow and Lent in trust for them, and also the one-half interest retained by Timms. Timms denied that he had ever delivered the deed to Koch of August 3, 1920, and Koch also testified that he received only the deeds from Dail purporting to convey the Garrett royalty to Koch.

There was testimony in the record tending to prove that Bray, before and after the written contract of October 12, 1921, by his conduct and conversation showed that he didn't have the entire interest in the Garrett royalty; that he (Bray) was a trustee, etc.; that he was endeavoring to raise money to purchase, in connection with Timms, the interest of Koch, Marlow and Lent in such Garrett royalty. This testimony was to the effect that, after this contract, Bray stated to several that he had $2,500 interest in it, and that Timms was the "lucky dog,"—that he, Timms, had the largest interest. There is much testimony of this character.

Both Timms and Mrs. Timms testified to the effect that Bray recognized Timms' interest, and promised to

issue to him a certificate showing that he held such interest in trust for Timms, but that afterwards he failed and refused to do so.

On the other hand, Bray, in his answer, denied that he purchased only an undivided interest in the Garrett royalty, as set up in Timms' complaint, and denied that he was to hold the Garrett royalty in trust for any one, but alleged that he purchased from Koch the entire Garrett royalty. The allegations of his answer concerning this are as follows:

"That prior to the purchase by this defendant of said royalty, plaintiff, Lewis W. Timms, had been arrested upon criminal charges preferred by said George B. Koch, L. C. Marlow and Gus Lent, charging plaintiff with fraud and obtaining money under false pretenses in connection with the sale of said Garrett royalty from said H. L. Dail to said Koch, Marlow and Lent; that such criminal prosecutions were pending in the circuit court of Daviess County, Missouri, at the time of the purchase of said royalty by defendant; that said Koch, Marlow and Lent were acting together and in concert in instituting such prosecutions, and, in order to obtain the consent of said parties to the dismissal of any or all of said charges, it was necessary to restore to said Marlow and Lent the $5,000 paid by them, as well as to said Koch the $2,500 note given by him; that plaintiff was without funds, and appealed to this defendant to purchase said royalty by paying to said Marlow and Lent the $5,000 paid by them, and agreed to return to said Koch the $2,500 note given by him; that at that time said $2,500 note had been transferred to a friend and business associate of plaintiff, who had instituted suit thereon against said Koch, which said suit was then pending and contested by said Koch on the ground that said note had been obtained by plaintiff through fraudulent means and pretenses; said note, being involved in doubtful litigation, was of little or no value, and plaintiff agreed with defendant that, if he would buy said royalty at the price of

$5,000, he, the plaintiff, would procure and surrender to said Koch the said note of $2,500, in order that defendant might be able to secure from said Koch a deed of conveyance covering the entire royalty; it was agreed between plaintiff, this defendant, and said Koch, Marlow and Lent, that this defendant should pay to said Marlow and Lent the said sum of $5,000, and that he should receive therefor a deed of conveyance for, and become the sole owner, legal and equitable, of the Garrett royalty; that the return of said $2,500 note was not made in consideration of any interest held by said George B. Koch, but was made to induce said Koch to execute to defendant a conveyance of the entire Garrett royalty and to abandon the prosecution of plaintiff on the criminal charge aforesaid; that plaintiff procured and delivered to this defendant an abstract of title to said property, purporting to show the title to said royalty interest, and which did show, by recorded conveyances, that H. L. Dail had purchased said royalty from Garrett, the landowner, and that said H. L. Dail had sold and conveyed the same to George B. Koch, and the said Lewis W. Timms advised this defendant that the title thereto was good and perfect, and that the conveyance of George B. Koch to this defendant would vest in this defendant a good title, and that the statements of said Lewis W. Timms were verified by said abstract and his examination thereof, and he was induced thereby to purchase the same; that, pursuant to said agreement, defendant did pay over to said Marlow and Lent the sum of $5,000, and a deed of conveyance was executed by said Koch and delivered to defendant, conveying to him the entire interest in the Garrett royalty, without reservation, and the same was accepted by defendant in the belief that it conveyed the apparent legal title of said Koch, and without any knowledge of any claim on the part of plaintiff to an equitable interest therein, and no such claim was ever made to him by plaintiff until said royalty promised to become valuable.''

To sustain these allegations, in addition to the documentary evidence above referred to, Bray adduced, in substance, the following oral testimony: John C. Leopard testified that he was the attorney for the Pattonsburg Savings Bank, and that the bank had instituted suit against Koch on a $5,000 note executed by Koch to Timms for an interest in what is known as the Garrett royalty, which note had been indorsed by Timms to the bank. Timms had been arrested on the 22d of September, 1921, on a charge lodged against him by Koch, Marlow and Lent, the charge being that he had obtained $2,500 from Marlow by false representations in the sale of the Garrett royalty, and the sum of $5,000 from Gus Lent and also $5,000 from Koch by false representations in the sale of the Bridges royalty. On Sunday, the second of October, 1921, witness and Bray were in Kansas City to obtain evidence to be used in the suit of the bank against Koch. This suit had been set for trial on the 12th of October, 1921. They went to the office of Timms, and, at his request, they went to the office of Timms' attorney, McClintock, and were there introduced to him, Meyers and Quant. McClintock advised Timms to make arrangements to either resell these royalties or buy them back on his own account. Timms stated that he had recently spent $16,000 in drilling a dry well, but thought he could raise the money if he had some time. Timms asked Bray to see the people who bought the royalties and find out on what grounds they could be bought back. Timms said that he would come to Pattonsburg in a short time, and he and Bray would see what kind of a proposition they could get from Koch, Marlow and Lent, and in the meantime he would try to raise the money necessary to buy the royalties. There was no talk at that time as to what interest Koch, Marlow and Lent had in either of the royalties, and nothing was said about Timms having any interest whatever in either of them, and nothing said as to how or in whose name the title would be taken. There was some talk with reference to a conver-

sation with Scott Miller to the effect that the parties were claiming interest on the money, and that the royalties might be purchased for their face. Timms, in the conversation, stated, in regard to the note for the Garrett royalty, that he would take care of it or control it. He figured how much it would take to settle the $2,500 note for the Garrett royalty, and for the Bridges royalty it would take about $16,000; that the royalties were worth the money, and that the Garrett royalty was worth the most money. Witness and Bray left with the understanding that Timms was coming over into the Pattonsburg country within the next day or two, and he and Bray were going to try to sell the royalties. Witness further testified that one Emil Bleish, Robert E. Maupin and Rolla Bray, who were witness' clients, furnished a bond for Timms in the criminal prosecution. Witness appeared in connection with Timms' attorney, McClintock, to renew the bond which had been given before the justice of the peace. Timms and witness at that time had not made a contract of employment, but it was supposed that they would. Witness would have appeared for him at that time, as a favor, if he had never seen him before. After the difference came up between Timms and Bray and the other parties about the Arkansas royalties, witness informed McClintock that he represented these parties, and, in consequence, he never asked Timms for any agreement about an attorney's fee, and did not consider that the relation of attorney and client existed between him and Timms at the time he was representing him in the bond matter. What he did was more for McClintock, Timms' attorney, than it was for Timms.

Two witnesses testified that they were local real estate brokers at El Dorado, dealing in leases and oil royalties, on the 12th of October, 1921, and their testimony showed that the sum of $5,000 was a fair average value for the Garrett royalty. Appellant introduced a letter from Miller to Bray concerning the consumma-

tion of the contract of October 12, in which Miller stated that he was inclosing leases and assignments of Garrett and wife to Dail, of Dail to Timms, and Timms to Koch, being all the title that his clients had, and instructing Bray to have the deed prepared for Koch to sign, and he would see that such deed was executed; and also a letter afterward to the effect that he inclosed a copy of the deed which he had sent to Koch, to be executed as Bray and his attorney desired, and another letter advising Bray that everything was in readiness for him at the proper time.

The testimony of Bray, so far as it is necessary to set it out, is that he told Timms that, if he bought the Garrett royalty he would not go into any syndicate nor sell it out to anybody, and that was before he contracted for it with Miller. He had the abstract of title which showed the interest of Koch, Marlow and Lent in the Garrett royalty, and that Miller said nothing at all about any interest. Miller asked that Koch, Marlow and Lent have their money back, with interest, and that, if Bray got that, Miller was to convey the title to a one-sixteenth royalty. The (original) Garrett royalty was a one-eighth of all the oil, and witness was buying a one-sixteenth of all the oil. He offered $5,000 with no interest, and it was accepted. Miller afterwards told him that he had all the papers in the case from Koch, and witness had an abstract showing that the title was in Koch to the Garrett royalty. Nothing was said about anybody's interest. They talked of the royalty. He told Miller that he would give $5,000 for this royalty, and Miller replied that he was going to advise his clients to take it, and he was sure that Bray would get it. Timms told witness that he had sold the Garrett royalty and had got $5,000 in cash and a note for $2,500, and that he had sold one-half, and he showed witness the abstract showing title in Koch. Timms never told witness what interest in the Garrett royalty any of them was to get. He told witness that this royalty was deeded to Koch direct. He

never had any talk with any one about the fact that Koch held the title to the Garrett royalty as trustee. He was never advised of any declaration of trust, and there was none shown to him, either in McClintock's office or anywhere else, or any certificates of interest. Witness saw in the abstract, before he had paid $1,000 on the contract, that there was an assignment of an interest to Thompson, and the abstract showed that there was a deed from Dail to Koch, and the record showed that Timms had no interest whatever at that time, and he knew nothing of the assignment from Dail to Koch; found that later; had never seen the deed from Garrett to Dail until it was sent to him. At some discussion with Timms about the Thompson matter, Timms said he didn't know Thompson had a deed. Witness told Timms the abstract showed it, and Timms explained that it was never delivered. Witness had understood that Lent and Marlow had an interest in it, and that they would not sell any unless they sold it all. Timms had to give their money back, and he had to do it on all of it, Garrett and Bridges both. He knew that Koch had an interest in it. The abstract showed that he had the royalty. He never talked to Koch about it. Witness categorically denied that he had any conversation in the office of McClintock, on the Sunday evening referred to by the attorneys, to the effect that Lent, Marlow and Koch each had a one-sixth; that what was talked about there was the amount of money it would take to buy these royalties, $15,000 for the Bridges, and $5,000 to be paid in cash for the Garrett royalty. He had the abstract examined by his counsel, Leopard & Alexander. The abstract showed the interest that Koch held. Counsel advised that the title was in Koch, and that a deed from Koch would make Bray's title good. He denied that Timms told him that he had a half interest in the Garrett royalty, and denied that Mrs. Timms ever called him up and asked him to make conveyance to Timms or Mrs. Timms to any interest in the Garrett royalty. He

thought that Timms went down to sell McClary some of the Bridges royalty. He was not to sell any interest in the Garrett royalty. He told Timms all the time that he would not sell any of the Garrett royalty unless he sold it all. He positively denied that he had told any of the guests at Bramhall's of the interest he had in the Garrett royalty. He didn't tell them that he had $2,500 in it, because he had bought it for $5,000, and he denied that any such conversation took place there as the witnesses for Timms stated. Witness stated that he first agreed to buy the Garrett royalty from Timms on October 15, 1921. Timms said then that he didn't have any interest in it, and, according to the abstracts, he didn't have any interest in it. At the time he made the contract with Timms, Mr. Maupin was present. Timms stated that, if witness would buy the Garrett royalty, he (Timms) would go ahead and raise the money for the Bridges royalty and have it at Maysville on October 12 to take the Bridges royalty and stop these suits, and get from under it himself; that the Garrett royalty was the one that he was uneasy about; that he sold that himself direct. He was not uneasy about the Bridges royalty, because he never sold it. The contract was that he (Bray) was to put up $5,000 for the Garrett royalty and Timms was to procure Koch's note and turn it over to witness, free of cost, to turn back to Koch, which he did, and witness delivered the note to Koch's attorney, Scott Miller. Timms turned over to witness the abstract to look up the title. He said that he had sold the Garrett royalty direct to Koch, and didn't sell the Bridges royalty, and was not afraid of prosecution on the Bridges royalty, but he was on the Garrett royalty. Witness was to have the Garrett royalty—the full one-sixteenth of production.

Bleish, a merchant and farmer, who went on Timms' bond, testified that Timms wanted to sell him an interest in the Garrett royalty, and witness stated that he named Koch, Marlow and Lent as having an interest in

the Garrett royalty, and he understood from Timms that Koch had practically all of it. Timms didn't tell witness that he (Timms) owned any of it. He said that it would take $7,500 to handle it. Witness considered that that was to handle all of it. Timms didn't tell witness who held the title.

Another witness stated that he had heard of Bray buying, or trying to buy, the Garrett royalty, and witness asked Timms if he was a partner of Bray, and Timms said, "No," that he had no interest with Bray, that he (Bray) had made a good investment by getting in on the ground floor, and it would make him a rich man. Timms told witness that Bray had a half interest, or one-sixteenth royalty, or something to that effect. That was said at the October term of the court, 1921. Witness might be mistaken about his saying one-half, but he knows that Timms said Bray had a one-sixteenth.

Another witness, a farmer and director of the Pattonsburg Bank, stated that he had a conversation with Timms in 1921 in regard to the Garrett and Bridges royalties. Timms was talking about selling witness some royalty, and spoke about Bray having bought some in the Garrett royalty for $5,000, and about selling the Bridges royalty for $15,000, and stated that, if he could sell that, he could pay off his note to the Pattonsburg Bank. Witness understood that Bray had bought the Garrett royalty for $5,000. Witness understood that it was a one-sixteenth Bray had bought. He heard Timms say, in the presence of Bray, that he had sold to Bray a one-sixteenth interest for $5,000.

Another witness, vice president of the bank at Weatherby, testified that she had some talk with Timms about the Garrett royalty. She was to take some part of it, and went to Timms after his trip down to El Dorado, to see about getting it, and he said that he had sold it all and could not let witness have any. That was some time in December, 1921.

Another witness, who was president of the bank at Pattonsburg, stated that the bank had bought a note of Koch from Timms. Timms had been arrested for obtaining the note under false pretenses, and witness was called on by Bray to go on Timms' bond, and witness went on the bond with Bray. Koch was pleading fraud in obtaining the notes as defense to the bank's suit. Timms was anxious to get things adjusted in some way, and said, in his conversation, that he had sold the Garrett royalty himself, but had not had anything to do with selling the Bridges royalty; that he was not afraid of any prosecution on the Bridges royalty. On October 5 Timms' proposition was to let Bray take the Garrett royalty for $5,000 that Lent and Marlow had paid in, and that he (Timms) would procure the $2,500 note in litigation given by Koch to him. Timms said that that note really belonged to him anyhow at that time, and if Bray would take it he would secure the note and turn it in on the deal. This talk was about the time the case was set for trial at Maysville. Timms was to have no interest whatever in the Garrett royalty. The case was set for trial on October 12. Witness was informed that, if he would continue the case, the money for the payment of the note would come from some one in Arkansas. The contract of October 12 was signed that morning. Witness did not see Koch or Marlow sign it. Lent and Bray were there, and witness saw Bray sign the contract, and knew Koch's signature. The contract was read, and Timms was present at the time. Witness thought that, on the night of the 23rd of September, at the bank, or on the 5th of October, when Bray and Timms were present, Timms said that Koch, Marlow and Lent each had a one-third of a one-sixteenth in the Garrett royalty. Timms never told witness that he had a half interest in the Garrett royalty. He never had any discussion with Timms and Bray relative to the syndication of the Garrett royalty, and witness had no agreement with Bray that he was to obtain a part of the interest

in the purchase of the royalty. Neither witness, nor the bank of which he was president, loaned Bray any money on that account. Witness loaned Bray the money to purchase the interest McClary claimed to have in the Garrett royalty, which was to the amount of $750. Bray brought abstracts of the Bridges and Garrett royalties to the bank before he purchased the Garrett royalty. Witness saw the abstract, and it showed that the title was in Koch.

Timms, in rebuttal, testified that he never had any conversation with Maupin and Bray at Cameron in his life, and denied that he was present at Maysville at the time the contract of October 12 was signed between Bray, Koch, Marlow and Lent.

It was stipulated at the trial that Timms denied the testimony of the witness, Keeling, who had testified that he heard Timms say that he had no interest in the Garrett royalty, and had sold the same to Bray for $5,000, and had made a handsome profit.

There was testimony in the record to the effect that, when Bray was in El Dorado, after the purchase of the Garrett royalty, he sent telegrams to parties in Missouri, stating, in substance, that several wells had come in on the property, and that it looked like it was worth a million dollars.

While we have not stated *in haec verba* the testimony of the witnesses, we have endeavored to give the substance of the material testimony in the record, and believe that the above presents the salient facts upon which the trial court grounded its decree. The chancery court awarded Timms a half interest in the Garrett royalty, and directed Bray to execute a deed conveying to Timms an undivided one-half interest in the same. From that decree Bray appeals, and Timms also appeals from so much of the decree as awards him only an undivided half interest of the Garrett royalty instead of an undivided two-thirds interest.

1.    The oral testimony in this case is in such radical and hopeless conflict we have found it most difficult to determine where the preponderance lies, but, after a painstaking consideration of the material testimony, the substance of which we have set forth above, we are convinced that, even if it were permissible to prove an express trust by parol testimony, the appellee has not shown by a preponderance of the evidence that Bray holds an undivided four-sixths interest of the Garrett royalty in trust.    The facts of this record demonstrate most cogently the wisdom of the rule of law, declared by our statute, that ''all declarations or creations of trust or confidences of any lands or tenements shall be manifested and proved by some writing, signed by the party who is, or shall be by law, enabled to declare such trusts, or by his last will in writing, or else they shall be void. * * *''    Section 4867, Crawford & Moses' Digest. See original opinion in *Morris* v. *Nowlin Lumber Co.,* 100 Ark. 253; *Harbour* v. *Harbour,* 103 Ark. 273; *Carpenter* v. *Gibson,* 104 Ark. 32; *Veazy* v. *Veazy,* 110 Ark. 389.

This record discloses a controversy over a one-sixteenth royalty of the production of oil and gas in eighty acres of land in the El Dorado oil fields, which land is exceedingly valuable.    Bray holds the absolute record title to this Garrett royalty.    But, notwithstanding the fact that Bray holds the title by deed absolute in form, Timms alleges that he has title from the original owner which he has never placed of record; that, having such title, he sold a half interest in the Garrett royalty to three other parties, and the title was placed in one of them (Koch) as the trustee, to be held for himself and the other interested parties; that he entered into a contract with Bray by which he and Bray were to buy this half interest, and that he and Bray would then own the entire Garrett royalty, Timms owning a four-sixths of the entire royalty and Bray the remaining two-sixths.    But none of these transactions, involving the ownership of

royalty in gas and oil lands worth, according to optimistic telegrams in the record, perhaps a million dollars, were evidenced by writing. Timms offers oral testimony tending strongly to prove these transactions as set up in his complaint, but Bray denied that there were any such transactions, and also offers testimony which tends strongly to sustain his contention. Therefore, if oral testimony were allowed in such cases, sharp conflict would arise, making it most difficult to determine who had title to lands and interests therein. Hence we say the wisdom of the rule of law requiring that all express agreements or declarations of trust or confidences in lands shall be evidenced only by writing.

2. But the statute also wisely provides that, where any conveyance shall be made of any lands or tenements by which a trust or confidence may arise or result by implication of law, such trust or confidence shall not be affected by the above rule. See § 4868, C. & M. Digest Were the rule otherwise, a statute which was intended to prevent fraud would, in many cases, be a potent instrument of fraud. In *Morris* v. *Nowlin Lbr. Co., supra,* speaking of trusts which may arise or result by implication of law, we quoted from Mr. Pomeroy as follows: "The second great division of trusts, and the one which in this country especially affords the widest field for the jurisdiction of equity in granting its special remedies, so superior to mere recoveries of damages, embraces those which arise by operation of law from deeds, wills, contracts, acts or conduct of parties, without any *express* intention, and often without *any* intention, but always without any words of declaration or creation. They are of two species, 'resulting' and 'constructive,' which latter are sometimes called trusts *ex maleficio;* and both these species are properly described by the generic term 'implied trusts.' Resulting trusts arise where the legal estate is disposed of or acquired, not fraudulently or in the violation of any fiduciary duty, but the intent, in theory of equity, appears or is inferred or assumed from

the terms of the disposition, or from the accompanying facts and circumstances, that the beneficial interest is not to go with the legal title. In such case a trust results in favor of the person for whom the equitable interest is thus assumed to have been intended, and whom equity deems to be the real owner. * * * If one party obtains the legal title to property not only by fraud, or by violation of confidence or of the fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner." I Pomeroy's Equity Juris., § 155.

According to our statute, *supra,* and the above decisions and cases there cited, the parol testimony in this record was not admissible to establish an express trust, but it was competent and admissible to establish a resulting, or constructive, trust. According to Lord Chancellor Hardwick, in the case of *Lloyd* v. *Spillet,* 2 Atk. 148, trusts which arise by implication or operation of law are of three kinds: first, where the estate is purchased in the name of one person, but the money paid for it is the property of another; secondly, where a conveyance is made in trust, declared only as to part, and the residue remains undisposed of, nothing being declared respecting it; and thirdly, in certain cases of fraud where the transactions have been carried on *mala fide,* cited in *Trapnall* v. *Brown,* 19 Ark. 39, at page 48.

Applying the above familiar principles to the facts of this record, we do not discover anything in the evidence that would constitute Bray a trustee for Timms under the first or second of the above subdivisions. Timms did not furnish the money to pay for the Garrett royalty, the title to which was put in Bray, and the conveyance to Bray was not in trust declared only as to a

part, but it was an absolute conveyance of the entire Garrett royalty—that is, the entire one-sixteenth of the production. If Timms be correct in his contention, then this is a case where Bray, knowing that Timms had the title to an undivided half interest of the Garrett royalty and that Koch, Marlow and Lent, having title to the other undivided half, entered into an agreement with Timms whereby they were to purchase the undivided half owned by Koch, Marlow and Lent for the sum of $7,500, and that Timms should furnish the purchase money to pay for the interest of Koch in the sum of $2,500 and Bray should furnish the money to pay for the interest of Marlow and Lent in the sum of $5,000, and that title to the whole should be taken in Bray, but that he should hold the four-sixths undivided interest thereof in trust for Timms. But, on the other hand, if Bray be correct in his contention, he purchased the entire Garrett royalty of Koch, and, in order to enable him to effectuate the purchase, Timms agreed to procure and surrender to Koch, free of cost to Bray, the $2,500 note which Koch had executed to Timms, Bray paying the sum of $5,000, the residue of the entire consideration necessary to consummate the deal.

It was an entire transaction, and, if Timms be correct, Bray holds, not the entire Garrett royalty (a one-sixteenth of production), but an undivided four-sixths interest in trust for Timms; and Bray, 'in ignoring Timms' interest and in refusing to carry out the trust, should be declared a trustee *ex maleficio;* for, if such be the correct view of the facts of this record, Bray, in law, would be as to Timms' interest a trustee *ex maleficio.* So, in the final analysis of all the evidence, it occurs to us that the *crux* of this lawsuit is whether or not Bray should be declared a trustee *ex maleficio,* and required to convey to Timms an undivided four-sixths of the Garrett royalty— that is, a four-sixths of one-sixteenth, of the production. There is no middle ground. Bray, under the facts of this record, is a trustee, *ex maleficio,* of the entire four-sixths

interest claimed by Timms, or else he holds the entire Garrett royalty, a one-sixteenth of the production, absolutely in his own right and free from fraud.

Mr. Pomeroy says: "A second well-settled and even common form of trusts *ex maleficio* occurs whenever a person acquires the legal title to land or other property by means of an intentionally false and fraudulent verbal promise to hold the same for a certain specified purpose, as, for example, the promise to convey the land to a designated individual, or to reconvey it to the grantor, and the like, and, having thus fraudulently obtained the title, he retains, uses and claims the property as absolutely his own, so that the whole transaction by means of which the ownership is obtained is in fact a scheme of actual deceit. Equity regards such a person as holding the property charged with a constructive trust, and will compel him to fulfill the trust by conveying according to his engagement." 3 Pomeroy's Equity Jurisprudence (4 ed.), § 1055, quoted in *Moore* v. *Oates*, 143 Ark. 328, at page 335.

The law is well established that trusts *ex maleficio* will be declared "whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentation, concealment, or other undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means, or under any other similar circumstances, which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interests." See 3 Pomeroy's Eq. Jur. §. 1053; *Ussery* v. *Ussery*, 113 Ark. 36; *Barron* v *Stuart*, 136 Ark. 481; *Pharr* v. *Fink*, 151 Ark. 305. To reach a solution of the vexed question as to whether or not Bray is a trustee *ex maleficio* has given us great concern. It is more a question of fact than of law. In determining it, of course, we must apply the well-recognized rules for the production of evidence and the weighing of testimony. It is a well-settled principle that, while trusts resulting by operation of law may be

proved by parol evidence, yet the courts uniformly require that such evidence be received with great caution, and that it be full, free and convincing. *Colgrove* v. *Colgrove*, 89 Ark. 183; *Hunter* v. *Field*, 114 Ark. 128. See also *Nevill* v. *Union Trust Co.*, 111 Ark. 45.

In the comparatively recent case of *Barron* v. *Stuart*, *supra*, after citing numerous authorities relating to trusts arising *ex maleficio*, the court said, at page 489: "It is well settled by the above authorities that the parties seeking relief must establish the trust by clear and satisfactory evidence."

In the case of *Murchison* v. *Murchison*, 156 Ark. 403-407, we said: "While it is necessary that the proof to establish a resulting trust should be clear, satisfactory and convincing, it is not essential that it be undisputed."

Now, the deed to Bray being absolute in form, raises a strong presumption against the existence of a trust, and must be overcome, under the doctrine of our cases *supra*, by a greater weight of evidence than a mere preponderance. See also *Avery* v. *Stewart*, 136 N. C. 426. The parol testimony on behalf of Timms to establish a trust *ex maleficio* is met by parol testimony on behalf of Bray tending to controvert it in every particular essential to establish a trust in Bray *ex maleficio*. To say the least, there is a decided conflict in the parol testimony adduced on the issue as to whether or not there was a trust *ex maleficio*. Bray comes panoplied, not only with a deed absolute in form and with an abstract of title showing that his grantor, Koch, had the clear record title to the Garrett royalty—that is, to a one-sixteenth of production—but also with a contract of purchase upon which that deed was bottomed, which contract recites that the title Bray was obtaining was derived through a conveyance made by Timms to Koch, and that all the interest as conveyed in the deed from Timms to Koch should be conveyed to Bray, and also recites the assignment from Dail to Timms, and that Bray was to receive all the title which Garrett and wife conveyed to Dail by whatever conveyances necessary to properly assign said interest.

It is true that Timms denies that his deed of August 3, 1920, to George B. Koch, was delivered to Bray, and Koch also denied in his testimony that he received the same, but we do not understand that Timms denies in his testimony that this contract was entered into, nor does he deny that he was fully cognizant of its provisions, and there was testimony tending to show that he was present when this contract was entered into, and the only reason he didn't sign it was because the record title was in Koch. Timms does not deny that he executed the deed of August 3, 1920. He only says that the same was not delivered to Koch, and Koch says the same was not received. But the fact remains, and it is undisputed, that this deed, the day after the contract was signed, was sent to Bray in a letter, by Scott Miller, together with copies of the lease and assignment of Garrett and wife to Dail, and of Dail to Timms, and of Timms to Koch, with directions to Bray to prepare the deed that he wanted Koch to sign, and that it would be properly executed. There is no suggestion anywhere in the record that this deed was a forgery, or that it was surreptitiously placed among the other papers evidencing Bray's title and by mistake delivered with those papers to Bray.

Therefore, after reading through all this immense record, we feel bound to conclude that, amid the decided conflicts and inconsistencies in the parol testimony, the written documents upon which Bray bases his title must turn the scales in his favor. Certainly, it cannot be said that the oral testimony upon which Timms relies to engraft a trust upon Bray's deed is of that clear, satisfactory and convincing character exacted by the rules of evidence to establish a trust *ex maleficio*. If titles built upon documentary and record evidence could thus be overthrown, they would indeed rest upon very insecure foundations. The decree of the chancery court is therefore reversed, and the cause is remanded with directions to dismiss appellee's complaint for want of equity, and to quiet Bray's title in the Garrett royalty—that is, to an undivided one-sixteenth of the production of oil, gas, and

other minerals upon the eighty acres of land heretofore described, and for such other and further proceedings, according to law and not inconsistent with this opinion, as may be necessary to protect and preserve the rights of parties in interest.