## JONES *v.* JONES.

### Opinion delivered April 5, 1915.

1. CONSTRUCTIVE TRUSTS—PAYMENT OF PURCHASE PRICE—GIFT.—When the purchase money of land is paid by one person and the conveyance thereof made to another, a stranger, a trust results by operation of law to him who advances the purchase money, and if the nominal purchaser be the wife or child of the person paying the consideration, it is presumed to have been a gift or advancement, but a determination of the question as to whether or not such trust resulted from the transaction, depends upon the intention of the parties themselves.

2. CONSTRUCTIVE TRUSTS—PAYMENT OF PURCHASE PRICE—BURDEN OF PROOF.—Notwithstanding there is a presumption of a trust resulting to the party paying the consideration for the lands, the burden of proof in the whole case is upon the one who seeks to establish a constructive trust, and it can not be discharged and the trust established by a mere preponderance of the testimony, nor anything short of evidence that is clear, convincing and satisfactory.

Appeal from Randolph Chancery Court; *George T. Humphries*, Chancellor; affirmed.

STATEMENT BY THE COURT.

This suit was brought by appellees, the widow and children of W. G. Jones, to have F. F. Jones, appellant, declared a trustee of certain lands, and to enforce a resulting trust for a one-half interest in their favor, after the administratrix attempted unsuccessfully to set the conveyance aside, under section 81, Kirby's Digest, as made in fraud of creditors. *Jones* v. *Jones*, 107 Ark. 402.

The complaint alleged that on August 27, 1899, Eliza Kerr and her husband sold to J. L. Jones and W. G. Jones, the tract of land for $350, each paying one-half the purchase price therefor and that the deed was made conveying the said lands to Fred F. Jones, the minor son of J. L. Jones. That it was the intention of the purchasers that they should hold the beneficial interest in the lands notwithstanding the deed was made to Fred F. Jones; that they went into possession of said lands and remained in possession thereof as tenants in common from the date

of the conveyance until the death of W. G. Jones, each collecting one-half the rents and profits from the land; that by reason of the payment of one-half the purchase money by W. G. Jones, a trust resulted in his favor for an undivided one-half interest in the lands; that said W. G. Jones died intestate in 1909, leaving appellees, his widow and children who succeeded to his interest in the lands; that Fred F. Jones was in possession of said lands and had been since the death of said W. G. Jones and collected and received all the rents and profits therefrom from that time.

They alleged further that he had on February 27, 1908, executed a mortgage to Myra Bergstrom to secure an indebtedness of $700; that they were entitled to have the assets marshalled to require the mortgagee to exhaust the other securities before resorting to their undivided one-half interest in the lands; prayed for an accounting, that the court decree them to be owners of a one-half undivided interest, etc.

The answer admits that the appellees are the widow and only heirs of W. G. Jones, deceased; that the conveyance was made of the lands to Fred F. Jones by Eliza Kerr and her husband as alleged; denies that the lands were purchased by W. G. and J. L. Jones; alleged that they were purchased by J. L. Jones, the father of defendant, for him and the title taken in his name, his father intending the same as an advancement; that J. L. Jones paid all the purchase money; denied that W. G. Jones ever had any interest or equity therein and all the other allegations of the complaint. Alleged that his father, J. L. Jones, went into the immediate possession of the lands after the deed from Kerr was made and retained possession until the defendant arrived at the age of majority, when he went into possession thereof and had ever since claimed to be the sole owner under the deed of conveyance; denied that W. G. Jones ever had at any time any kind of possession or interest in the land; admitted that part of the rent was paid to W. G. Jones, but stated that the payments were voluntary and without obligation on

his part to pay same; admitted the execution of the mortgage to Bergstrom and pleaded laches and limitations.

The mortgagee answered and by way of cross-complaint adopted the answer of Fred F. Jones and asked the foreclosure of the mortgage.

It appears from the testimony that the mortgage was executed to secure the payment of a note for money borrowed after an examination and approval of the abstract of title by the mortgagee's attorney, and that she had no knowledge whatever of appellee's claim to the land. The deed of conveyance made by Kerr to Fred F. Jones recited a consideration of $50 paid in cash by W. G. and J. L. Jones and two promissory notes of $150 each, executed by them to said grantor.

J. L. Jones testified that when the deed was made to Fred F. Jones, he and his brother, W. G. (Willis) were in business together, that Willis went to St. Louis and contracted for goods on a credit, agreeing to give a mortgage on all the lands owned by both of them, including witness' home; that when he learned of this, he proposed that they would take the title to this land in Fred's name, in order that he might have a home in case they lost their lands and as W. G. was unmarried, he would not have any use for the land in case of failure of the business; that the mortgage was executed accordingly. He stated that he had control of the land in controversy from the time of its purchase until his son, Fred Jones, married, when he turned it over to him; that W. G. Jones never had control nor possession of the land. He said also that after the purchase, he told his brother, W. G., that he was to have one-half of the rents as long as he lived, provided he and Fred could agree and get along all right after Fred came of age. He said the first $50 of the purchase money was paid out of the partnership funds; that he sold a mare for $125, which was paid on the land, and that W. G. Jones helped to pay the remainder of the purchase price. He stated also that afterward he and W. G. purchased a tract of land, known as the Ellis place, consisting of eighty acres for $1,000; that the first $300 was paid out of

partnership funds; the next payment, about $250, was paid from rents of his wife's land, and that he agreed to pay a $600 debt of the firm to the Wear-Boogher Dry Goods Company in consideration that W. G. Jones would pay the same amount on the Ellis land, to which W. G. replied that it made no difference, and that this was done and that W. G. Jones never paid back any of these amounts.

He stated that W. G. Jones, from 1877 until his marriage, resided with him, and was never charged any board, but lived as a member of his family. Fred was born in 1881, was about ten years old when the lands were conveyed to him, and he turned the lands over to him upon the date of his marriage. He and his brother were partners in farming and merchandising, and "lived it up as we made it: We did not keep any books on each other." He paid toward the purchase price of the Ellis lands which was conveyed to W. G. Jones, over $400; there was no agreement between him and his brother that he was to help buy the Ellis lands for W. G.'s interest in the land in controversy; that he never had any claim on the Ellis land, made no improvements on it, and received no rents from it, and answering the question why Willis Jones was allowed to have one-half of the rents of the land in controversy said, "He was living with me, and we used it the same as if it belonged to both of us."

He stated that all the lands mortgaged to secure the partnership indebtedness including his home were sold under foreclosure proceedings.

Fred Jones testified that he had been in possession of the land since 1900; he acquired possession from his father; had made no contract with Willis G. Jones to pay him any part of the rent, but that he did pay him one-half of the rent of the place during his lifetime upon the request of his father and upon his father's representation that he had agreed with Willis Jones that Willis should have one-half of the rent as long as he lived. He never talked with his uncle about the matter but once just before his death; that they were fussing about something, not the

land, and "uncle told me that he was to have one-half of the rents until my death or his." That his uncle made no claim to any part of rents except one-half during his lifetime; testified that he borrowed the money from Mrs. Bergstrom, and that the mortgage securing it was valid, and had not been paid except a year's interest.

Mollie Jones testified that she had heard Willis, her husband, and Jas. L. Jones both say that the land belonged to Willis and Fred Jones, and that when Fred came of age he would make a deed to Willis of his one-half interest or make it satisfactory to him; that J. L. Jones said Fred would do this.

She stated also that the partners paid all the debts of the partnership and had the forty acres of land in controversy left free of debt. She said that both of them stated often that the land was paid for out of partnership money, and had heard Fred say that he and his Uncle Willis owned the land; that during her husband's lifetime, she never heard Fred Jones claim that her husband did not own one-half interest in the land, and that Jim, Fred's father, and Willis, paid for the clearing of the land about half and half, and Willis paid for one-half of the fencing, and that Willis paid for the buildings on the place. Her understanding of the deed being made to Fred was that the partners failed in business and put this land in Fred's name to hold until they could pay their debts and that was the only land they got to keep.

Five or six others testified that they had rented the lands in controversy from Jim and Willis Jones, and from Fred and Willis, and it was their understanding after Fred came into possession that it belonged to him and Willis Jones.

A witness testified that he rented the lands in controversy in 1904 from Fred and Willis Jones, first talked with Fred, who said he could not give him an answer until he saw his uncle Willis, as they were partners in it, and that witness saw both of them in a few days, and made the trade.

The chancellor found that the lands were purchased by J. L. and W. G. Jones, each paying one-half of the purchase money; that it was their intention to retain a beneficial interest therein and that the conveyance was made for convenience to Fred F. Jones and that a resulting trust arose in favor of W. G. Jones for a one-half interest, and that he and J. L. retained the possession of the land until Fred F. became of age, and afterward Fred and W. G. Jones retained the possession as tenants in common until the death of W. G. Jones. That he was owner of an undivided one-half interest therein, and that the mortgage of Bergstrom was valid and the debt secured thereby unpaid and decreed accordingly; that the mortgage should be foreclosed and one-half the proceeds of the sale, after its satisfaction, turned over to appellees, and from the decree in appellee's favor, Fred F. Jones appealed.

*S. A. D. Eaton* and *Witt & Schoonover,* for appellant.

1. No trust was ever created in favor of W. G. Jones, but if any was ever intended, it was an express trust which can never rest in parol. 67 Ark. 526; 45 *Id.* 481; 55 *Id.* 414; 39 Cyc. 24, 25; 103 *Ark.* 279; 104 *Id.* 37; 110 *Id.* 393.

2. The facts and circumstances fail to create a resulting trust. 105 Ark. 318; 79 *Id.* 418; 82 *Id.* 569; 104 *Id.* 303.

3. The claim is stale and barred. Kirby's Digest, § 5056; 56 Ark. 601; 58 *Id.* 95; 40 *Id.* 301; 40 *Id.* 62.

*T. W. Campbell,* for appellees.

1. The facts and circumstances clearly establish a resulting trust. 42 Ark. 503; 55 *Id.* 414; 67 *Id.* 526; 64 *Id.* 160; 101 *Id.* 409; 79 *Id.* 418.

2. The action is not barred by limitation nor laches.

The proof of a resulting trust is clear, full and convincing. 42 Ark. 503; 64 *Id.* 155. The findings of the chancellor are supported by the evidence.

KIRBY, J., (after stating the facts). (1) Where the purchase money of land is paid by one person and the conveyance thereof made to another, a stranger, a trust re-

sults by operation of law to him who advances the purchase money, and if the nominal purchaser be the wife or child of the person paying the consideration, it is presumed to have been a gift or advancement, but a determination of the question as to whether or not such trust resulted from the transaction, depends upon the intention of the parties themselves. *Keith* v. *Wheeler,* 105 Ark. 323.

(2) Notwithstanding there is a presumption of a trust resulting to the party paying the consideration for the lands, the burden of proof in the whole case is upon the one who seeks to establish a resulting trust, and it can not be discharged and the trust established by a mere preponderance of the testimony, nor anything short of evidence that is clear, convincing and satisfactory, leaving no well founded doubt upon the subject. *Keith* v. *Wheeler, supra: Hall* v. *Cox,* 104 Ark. 303; *Tillar* v. *Henry,* 75 Ark. 446.

The deed of conveyance of the lands in controversy recites that the consideration was paid, and to be paid by J. L. and W. G. Jones and the testimony of J. L. Jones is to the effect that the remainder of the purchase money was paid by them both. He does say that he paid more of his individual money toward the purchase of some lands conveyed to W. G. Jones by one Ellis, than was paid by said W. G. Jones for the purchase money of these lands, but he also said it was not his intention to claim any interest in the Ellis lands, and that he had none.

The testimony all shows that possession of this tract of land was held by J. L. and Willis G. Jones until the coming of age of Fred, son of J. L., and that the possession thereafter was held by Fred and Willis G. Jones and the rents equally divided between them during the lifetime of said Willis Jones. It was evidently the intention of Willis G. Jones to retain a beneficial interest in the lands purchased, notwithstanding they were conveyed to Fred F. Jones, the minor son of his partner, J. L. Jones, and he did retain such interest and enjoyed it with J. L. Jones until Fred came of age and from then on, with the consent of Fred F. Jones, appellant, until his death.

One witness testified that Fred said he and his Uncle Willis were partners in the land. The widow testified that he always recognized that his uncle had a one-half interest in the land, and did not dispute the fact until after his uncle's death, and he himself admitted that they enjoyed the rents of the land together, but said he allowed his uncle to collect and enjoy one-half the rents until his death because his father told him he had agreed that it should be done.

Willis Jones was in possession of the land at his death and the claim of appellee's, successors to his interest, is not barred by the statute of limitations.

We think the testimony is sufficient to sustain the chancellor's decree, and it is affirmed.