GORENFLO *v.* BROWN.

5-2304                                        343 S. W. 2d 564

Opinion delivered March 6, 1961.

222

*Cockrill, Laser & McGehee,* by *Howard Cockrill,* for appellant.

*H. B. Stubblefield,* for appellee.

Ed. F. McFaddin, Associate Justice. This is a suit filed by appellee Brown against appellants, Gorenflo and wife, seeking to have the Court declare and enforce a resulting trust upon a deed which is absolute on its face. The Chancery Court granted the Plaintiff the prayed relief and the defendants prosecute this appeal.

The land involved is a tract of 120 acres, called the "Old Home Place," which has been in the Brown family for several generations. In 1954, prior to the transaction here involved, Mr. Fred I. Brown, Sr. owned three-fourths interest, and the remaining one-fourth interest (subject to the dower and homestead of their mother) was owned in equal parts by five Brown children, being (appellee) Gordon G. Brown, (appellant) Mrs. Madolyn Brown Gorenflo, and their three brothers. Appellee, Gordon Brown, a bachelor, lived on the land with his mother; the Gorenflos lived in Buffalo, New York; and Mrs. Gorenflo made annual visits to Arkansas.

In 1954, Madolyn Gorenflo and her brother, Gordon Brown, negotiated with their uncle, Mr. Fred I. Brown, Sr.; and as a result Mr. Fred I. Brown, Sr. conveyed to the Gorenflos *all* of his undivided three-fourths interest for a consideration of $20,000.00, of which amount $5,000.00 was paid in cash by the Gorenflos and the balance was evidenced by the note and mortgage of the Gorenflos for $15,000.00, payable on or before fifteen years, and bearing interest at four per cent. per annum payable semi-annually. It is on the conveyance, evidenced by this deed from Fred I. Brown, Sr. to the Gorenflos,

that Gordon Brown seeks to impose a resulting trust in his favor. In his complaint, and in his testimony, he claimed that the Gorenflos purchased this three-fourths interest for him, and that he was to pay the full consideration of $20,000.00, plus interest; and that the title was taken in the name of the Gorenflos since he did not have the $5,000.00 to make the down payment. The Gorenflos, in addition to pleading the statute of frauds (§ 38-101, Ark. Stats.), claimed that Gordon Brown was to have only an undivided one-half interest in the three-fourths interest, and that he was to pay one-half of the $20,000.00 consideration of the Fred I. Brown, Sr. deed.

Trial in the Chancery court resulted in a decree that all right, title, and interest of the Gorenflos in and to the three-fourths interest[1] conveyed by Fred I. Brown, Sr. to them should be vested in Gordon G. Brown, upon payment into the Court of the $5,310.00 tendered by Gordon Brown (the balance due on the $5,000.00 down payment, plus four per cent interest), and the agreement by him to pay the $15,000.00 and interest (the balance due on the Fred I. Brown, Sr. note and mortgage). From such decree, the Gorenflos prosecute this appeal and list three points.

I. *Appellants Say: "Appellee's Evidence Is Unsatisfactory on The Whole, And Is Insufficient To Establish His Alleged Oral Agreement And The Resulting Trust Sought To Be Imposed."* The first question to consider is, whether the trust which Brown seeks to have declared is barred by the statute of frauds (§ 38-101, Ark. Stats.) since it was not in writing. We conclude that the trust here sought to be imposed is a *resulting trust,* and is not required to be in writing since § 38-107, Ark. Stats. exempts resulting trusts from § 38-101. *Bray* v. *Timms,* 162 Ark. 247, 258 S. W. 338; *Harbour* v. *Harbour,* 207 Ark. 551, 181 S. W. 2d 805. To review all of our cases on resulting trusts would be a work of supererogation, but we have two comparatively

---

[1] The result of the decree was to leave untouched the one-twentieth interest owned by Mrs. Gorenflo, as well as the one-twentieth interest owned by each of her brothers.

recent cases with factual situations very similar to the case at bar. They are *Crain* v. *Keenan,* 218 Ark. 301, 236 S. W. 2d 731; and *Payne* v. *Box,* 231 Ark. 301, 329 S. W. 2d 181.

In *Crain* v. *Keenan, supra,* Crain claimed that the Keenans were to buy land for him, taking the title in their names, and to convey to him when he paid them. The Keenans claimed that they purchased the land for themselves, and merely rented to Crain; and they pleaded the statute of frauds (§ 38-101, Ark. Stats.). We held the transaction between Crain and the Keenans was a resulting trust and that the statute of frauds did not apply. Likewise, in *Payne* v. *Box, supra,* it was shown that Box purchased the land for Payne but had the deed made to Box to hold title until Payne should repay him; and we held that the transaction was a resulting trust for Payne, which trust we enforced upon Payne's payment to Box of the amount due and interest. In addition to our own cases, the authorities generally are to the same effect. In 54 Am. Jur. 163, Trusts, § 210, cases from many jurisdictions are cited to sustain the text: "Where money is borrowed to purchase property, the lender taking legal title to the land in his own name to secure the loan, a resulting trust in the property, binding the lender in favor of the borrower, arises."[2]

We now examine the evidence to see if Brown has established the trust by evidence that is full, clear and convincing. *Frazier* v. *Hanes,* 220 Ark. 765, 249 S. W. 2d 842. Gordon Brown testified that he and his sister went to the office of Mr. Fred I. Brown, Sr., and initiated the negotiations that led to the conveyance of the property; and Gordon Brown claimed unequivocally that, "We went down in the summer of 1954, and approached my Uncle. The first thing she (Mrs. Gorenflo) said was, 'I came down here to see if we can tie up the old home place for Gordon. Gordon wants to buy the old home place.' My uncle said how much he wanted

---

[2] For other authorities holding a resulting trust arises in similar factual situations, see Restatement of the Law of Trusts, 2d Ed., §§ 448 and 456, and see also annotations in 42 A.L.R. 21, 135 A.L.R. 234, and 27 A.L.R. 2d 1290.

for it. . . We said, 'How about $20,000.00?', and he said, 'O.K.' . . . We agreed on four per cent interest. The deal was not closed as Madolyn (*i.e.* Mrs. Gorenflo) said, 'I will have to go back and talk to Tony[3] (*i.e.* her husband) and see if he will put up the down payment and let Gordon pay you back $1,000.00 a year, or $15,000.00 on or before 1969.'. . . That was the agreement that was made, and the deal was closed. . .

"Q. And you say that the agreement was that they were making the loan to you so that you could acquire the property?

A. So I could keep the old home place as my own.

Q. When the money was paid back, the property would be deeded to you?

A. Yes, sir."

Mr. Fred I. Brown, Sr. testified in person and by deposition, and gave this statement as to the transaction:

"In December, 1954, my wife and I executed a deed to Oscar B. Gorenflo and Madolyn E. Gorenflo, his wife, covering our interest in 120 acres of land, more or less, in Section 35, Township 1 North, Range 12 West, Pulaski County, Arkansas, known by the Browns as the 'Old Home Place.' The consideration for this deed was $20,000.00, of which $5,000.00 was paid in cash and $15,000.00 payable on or before fifteen years after date with interest thereon payable semi-annually. This deed was executed in keeping with an agreement made by my niece, Madolyn E. Gorenflo, my nephew, Gordon G. Brown, and me at a meeting in my office in the summer of 1954 and the agreement was that said lands conveyed were being purchased for my nephew, Gordon G. Brown, and the lands were conveyed to the Gorenflos as security for the money and credit which they were furnishing for my nephew, Gordon G. Brown."

It is undisputed that Gordon Brown regularly paid to the Gorenflos all of the interest due on the Fred I. Brown,

---

[3] Although Mr. Gorenflo's first name is *Oscar*, the witnesses called him "Tony."

Sr. note, regularly paid all taxes and insurance, and continued to live on the place. Gordon Brown introduced two letters which his sister, Mrs. Gorenflo, wrote him. In June 1956 she said in part:

"Just a note to let you know that it is time again for another interest payment to Uncle Fred. Also I have been wanting to write and tell you that the taxes come to $132. Tony paid that so if you can will you send them both real soon. . . Also I think you should start paying us back our money now after two years and get in shape to meet the $15,000 in 15 years. You know that time will go fast. Maybe we could work out some plan like a bank. . . . Will close for now but send the money soon as Tony wants to mail it to him before the 1st."

Then, in another letter in 1958, Mrs. Gorenflo said:

"Also in the last letter I sent you the amount of the taxes on the place that Tony paid before the 21 of April. If you don't have the amount I will send it to you as Tony has the papers put away — it was around $300. Also don't forget the July 1st date for interest money. Do you ever see James, Billy, or Fred? . . . Now that Mother is gone you should start paying off on it each year — 15 years go by fast."

As opposed to all of the testimony for the plaintiff, the Gorenflos at first denied that Brown had any interest in the property purchased from Fred I. Brown, Sr.; but, in her testimony, Mrs. Gorenflo took the position that she and her brother, Gordon Brown were to be equal owners of the interest purchased from Fred I. Brown, Sr., and she introduced a letter that Gordon Brown wrote her under date of January 19, 1955, which contained this language:

"In reply to your letter of January 4th find enclosed paid receipt for 1 year for $7,500.00 insurance on the house. This insurance is for 5 years, and will be a little cheaper next year. Tony do you want one half interest in this deal or do you want me to pay you 4% interest

on the $4,100 that you have tied up.[4] If we go in on a 50% deal I think I should only pay you interest on $2,050.00 and ½ interest to Uncle Fred, and ½ of taxes and ½ of insurance etc.

"If you do not want any interest in this deal I will mail you $382.00 for the 4% interest on $19,100 for 6 mon. and before Jan. 1 I will mail you $1382.00 for interest and $1000 is for principal."

Mrs. Gorenflo claimed that she answered the letter in the affirmative; but Gordon Brown denied the receipt of any such answer. Mrs. Gorenflo's explanation as to why her brother paid all of the taxes and insurance and interest on the Fred I. Brown, Sr. note was because her brother was occupying the property and such payments constituted rent; and she used the letter that he wrote her to support her claim of equal ownership in the Fred I. Brown, Sr. deed. But to us, the letter that Gordon Brown wrote to his sister in 1955 and the subsequent conduct of the parties are strong circumstances to support Gordon Brown's contention. It is evident from the letter that Brown offered his sister and her husband a one-half interest in the lands that were covered by the Fred I. Brown, Sr. deed, on condition that if the Gorenflos took the one-half interest, then Gordon Brown would only be required to pay one-half of the Fred I. Brown, Sr. interest, and one-half of the taxes and insurance. The evidence establishes that Gordon Brown continued to pay *all* of the Fred I. Brown, Sr. interest, *all* of the taxes, and *all* of the insurance. So it seems clear that the Gorenflos never accepted Gordon Brown's proposition as contained in the letter. Furthermore, the letters that Mrs. Gorenflo wrote to Gordon in 1956 and 1958 show that she was, all the time, expecting to receive from Gordon Brown all of the interest on the Fred I. Brown, Sr. note, and all of the taxes; and her letters go far to disprove her own testimony.

The evidence shows that the mother of Gordon Brown and Mrs. Gorenflo passed away in 1957, at the

---

[4] It is undisputed that Gordon Brown sold timber from the land and sent $900.00 to the Gorenflos.

age of eighty years. Gordon Brown remained a bachelor until after his mother's death, and his sister, Mrs. Madolyn Gorenflo, was the beneficiary in his life insurance policies and also the beneficiary under his then existing will. But after the death of his mother he married and has a child; and it is reasonable that Mrs. Gorenflo's attitude took a decided change. During all the years from 1954 to the present, Gordon Brown has continued to live on the property and has made substantial and valuable improvements, more consistent with his claim of ownership than with any other hypothesis. After a thorough review of all of the evidence, we conclude that Gordon Brown met the heavy burden imposed on him.

II. *Appellants Say: "The Evidence Relied Upon By Appellee To Corroborate His Testimony Equally Supports The Claim Of Appellants; And Under The Law A Resulting Trust Will Not Be Imposed Where The Transaction Is As Consistent With Another Relationship."* We give no lengthy discussion to this point, because, as previously stated, the evidence convinced the Trial Court, and convinces us, that the appellee, Gordon Brown, met the heavy burden imposed upon him of proving the resulting trust by presenting the *quantum* of evidence required.

III. *The Appellants Say: "Appellant Oscar B. Gorenflo Was Not A Party To Appellee's Alleged Oral Agreement, He Did Not Know Of The Claim Until The Filing Of This Action And Therefore Did Not Acquiesce In Same, And He Cannot Be Bound Thereby."* As to this point, little need be said. When the original negotiations were made with Mr. Fred I. Brown, Sr., Mrs. Gorenflo returned to Buffalo and reported it all to her husband and he sent a $1000.00 check as earnest money to Gordon Brown for delivery to Mr. Fred I. Brown, Sr., and in the letter of transmittal, Mr. Gorenflo wrote to Gordon Brown: "I hope the enclosed check will be a 'moving force' in the right direction. I am an outsider—looking in, and feel and trust that you and Madolyn are doing the proper thing. Good luck, and keep me posted." Furthermore, Mr. Gorenflo testified: "Q.

Whatever arrangement your wife had made here was agreeable to you? A. Absolutely." It is clear that Mr. Gorenflo agreed to all that his wife did; and was as much obligated as she was.

*Conclusion.* After a thorough review of the entire record, we conclude that the decree of the Chancery Court should be affirmed.