L. C. HENSLEE and Willa Dean HENSLEE
*v.* E. S. KENNEDY and Jewell KENNEDY

76-383                                    555 S.W. 2d 937

Opinion delivered September 19, 1977
(In Banc)
[Rehearing denied October 24, 1977.]

*Eugene Hunt,* of *Hunt & Jamison,* for appellants.

*Charles F. Gibson,* for appellees.

JOHN A. FOGLEMAN, Justice. This action involves the interests of the parties in certain lots in Arkansas City on which

there is a grocery and liquor store. Appellees filed a complaint in chancery, praying for an accounting, asserting that they owned the property in partnership with appellants. Appellants counterclaimed asserting that appellees had only a security interest. The complaint was dismissed on motion for summary judgment on the ground that it was barred by the statute of limitations. There is no appeal from that action. The counterclaim was dismissed after a trial on the merits. The trial court found that appellants had not proved by clear, cogent and convincing evidence that there was an oral contract to convey the property to them.

Appellants alleged in their counterclaim that appellee E. S. Kennedy secured the sum of $8,500 at appellants' request for the purchase of the property in question and requested that his (appellee's) name appear on the deed for securing the loan made to appellants; that appellee promised to execute a quitclaim deed with release of dower to appellant upon repayment of the $8,500, all of which has been paid; that appellants have paid all the sums owed to appellee regarding the purchase of the property and have made demand of appellees to execute the deed, but they refused; and that appellee, E.S. Kennedy, was trusted. They prayed that the court rule that appellee holds title to the property as trustee and order a conveyance by him to them. Appellees answered by a general denial.

These allegations stated a cause of action for the declaration of an implied trust, and, more specifically, a resulting trust. This is a trust that arises by operation of law, rather than by express agreement and it may arise despite the fact that there is no manifestation of intention to create an express trust. *Harbour* v. *Harbour,* 207 Ark. 551, 181 S.W. 2d 805. A resulting trust arises, not out of an agreement, but out of the circumstances surrounding the transaction, indicating that the beneficial interest is not to go with the legal title. *Darsow* v. *Landreth,* 236 Ark. 189, 365 S.W. 2d 136.[1] It is presumed to

[1]We are not unaware of the statement in *Harrison* v. *Cruse,* 233 Ark. 237, 343 S.W. 2d 789, that the person there seeking to impress a resulting trust on property, claiming that he had paid a portion of the price, had the burden of proving by clear, cogent and convincing evidence that he paid a portion of the purchase price under an agreement then made with the

arise in favor of one who pays or secures the purchase price for land at the time of the transaction when the deed is taken in the name of another. *Hunt v. Hunt,* 202 Ark. 130, 149 S.W. 2d 930; *Jones v. Jones,* 118 Ark. 146, 175 S.W. 520. We have long recognized the applicability of the general rule prevailing in other jurisdictions that a resulting trust arises when the person who takes the title holds it as security for his advance of the purchase money as a loan to the person claiming the benefit of a resulting trust. *Byers v. Danley,* 27 Ark. 77; Restatement of the Law, Trusts 2d, § 448 p. 410. This rule has been applied by us in *Crain v. Keenan,* 218 Ark. 375, 236 S.W. 2d 731; *Payne v. Box,* 231 Ark. 301, 329 S.W. 2d 181 and *Gorenflo v. Brown,* 233 Ark. 221, 343 S.W. 2d 564. In *Crain,* we said that the result is the same as though the transferee first lent the amount of the purchase money to the borrower and the borrower then paid the amount borrowed to the vendor and the conveyance was then made by the vendor to the lender.

There are certain preliminary points we must address before reaching the merits of appellants' counterclaim. Appellants contend that the chancellor erred in denying their motion for summary judgment on the counterclaim. The denial of a motion for summary judgment is not subject to review even after final judgment in a suit. *Widmer v. Ft. Smith Vehicle & Machinery Corp.,* 244 Ark. 971, 429 S.W. 2d 63; *Deposit Guaranty Nat. Bank v. River Valley Co., Inc.,* 247 Ark. 226, 444 S.W. 2d 880; *Williams v. Varner,* 253 Ark. 412, 486 S.W. 2d 79. However, the alleged error on which appellants base their argument is subject to review: that is, that the trial court erred in finding that appellees' answers to requests for admission were sufficiently verified; therefore, the matters requested were admitted.

The requested admissions were denied by appellees but there was no statement or verification in the body of the document that appellees swore to the truth of their answers. The document was signed by appellee E. S. Kennedy and a notary

grantee in the deed that he would have an interest in the property. This statement was properly applicable in that case because of the relationship of the parties and the course of dealings between them. As a general rule, it is out of harmony with other cases, because the trust arises from a presumed intention of the parties and is not dependent upon any kind of agreement.

public's jurat followed his signature. Appellants complain that the notary's jurat is not sufficient verification. Ark. Stat. Ann. § 28-358 (Repl. 1962) requires that a party, who wishes to deny specifically the matters of which an admission is requested, serve upon the party requesting admission "a sworn statement" so denying the matters. All of the cases cited by appellants and others which we have examined either found error or affirmed on the ground that the denials were not "verified." None of these cases has answered the question whether a notary's jurat constitutes a sufficient verification; and none of them has stated what would otherwise be a sufficient verification.

"Verification" is sometimes taken to mean simply confirmation of correctness, truth, or substantiation by affidavit, oath, or deposition; swearing to an affidavit. *McNamara* v. *Powell,* 52 N.Y.S. 2d 515 (1944); *Marshall* v. *State,* 116 Neb. 45, 215 N.W. 564 (1927); *Herbert* v. *Roxana Petroleum Corp.,* 12 F. 2d 81 (D.C., Ill.). "Sworn to" is frequently used interchangeably with "verified" and implies that the subscriber shall have declared upon oath the truth of the statement to which his name is subscribed. *Ashley* v. *Wright,* 19 Ohio St. 291 (Critchfield) (1869); *Indiana Quarries Co.* v. *Sims,* 158 Ky. 415, 165 S.W. 422 (1914); 83 C.J.S. p. 929. The requirement of verification has been held to require the swearing to the truth of his statements by the subscriber and certification thereto by an officer authorized to administer oaths. *Gossard* v. *Vawter,* 215 Ind. 581, 21 N.E. 2d 416 (1939); *In re James Passero & Sons, Inc.,* 261 N.Y.S. 661, 237 App. Div. 638 (1933).

The notary's statement appended to the response to the request for admissions is called a "jurat," which is a certificate evidencing the fact that the instrument was properly made before a duly authorized officer. See Black's Law Dictionary (4th Ed.). In distinguishing between a jurat and an acknowledgment, this court said ". . . a jurat is a simple statement that an instrument is subscribed and sworn to or affirmed before a proper officer without the further statement that it is the act or deed of the person making it." *Pardo* v. *Creamer,* 228 Ark. 746, 310 S.W. 2d 218. A jurat has been held to be prima facie evidence that an affidavit was properly

made. *Stern* v. *Board of Elections of Cuyahoga County,* 14 Ohio St. 2d 175, 43 Ohio Ap. 2d 286, 237 N.E. 2d 313 (1968).

It has also been held that proof of service was sufficient even though the body of the affidavit failed to declare that the statement was made under oath (it used the word "certify"). In *Mitchell* v. *National Surety Co.,* 206 F. 807 (D.C. N.Mex. 1913) the court explained:

> . . . [E]vidence by the jurat of the administering of the oath is sufficient to make it a written statement under oath and thus an affidavit, notwithstanding the affiant fails to state over his signature that he is declaring under oath . . . [I]ts very function . . . is to show that the statement has been made under oath before a competent officer. Using it for that purpose, it is efficient to show that the statement was made under oath even if the affiant fails to so recite.

See also, *White* v. *Heber City,* 82 Utah 547, 26 P. 2d 333 (1933); *Tucker* v. *State,* 244 Md. 488, 224 A. 2d 111 (1966), cert. den. 386 U.S. 1024, 87 S. Ct. 1381, 18 L. Ed. 2d 463; *Greene* v. *Lombard,* 33 Ga. App. 518, 126 S.E. 890 (1925).

We have held that it was not necessary for an affiant to sign an affidavit (required by statute) that an appeal was not taken for the purpose of delay. *Gill* v. *Ward,* 23 Ark. 16. The requirements were stated: " . . . he must swear to the facts stated, and they must be in writing . . . [A]nd as evidence that it was sworn to by the party, whose oath it purports to be, it must be certified by the officer before whom it was taken; which certificate is commonly called a jurat, and must be signed by such officer." Accord, *Huff* v. *Commonwealth,* 213 Va. 710, 194 S.W. 2d 690 (1973). See also, *Mahan* v. *Owen,* 23 Ark. 347. We have held that the statutory form and requisites of verification of pleadings [Ark. Stat. Ann. §§ 27-1105 et seq (Repl. 1962)] do not apply to discovery. *Young* v. *Dodson,* 239 Ark. 143, 388 S.W. 2d 94.

Because there is no statute or judicial precedent requiring that the party denying admissions state in the denial that he does so on oath, the notary's statement that he was sworn

was sufficient evidence that the denial was under oath.

Appellants also asserted that the trial court erred in failing to declare a mistrial when the chancellor inadvertently saw an offer of settlement by appellant which was shown to Kennedy to refresh his memory on another matter. We will not pass on the admissibility of the letter because it was not argued that the court erred in excluding it from evidence.

The drastic remedy of mistrial should be a rarity in a chancery court. It should not be resorted to unless justice cannot be served by continuing the trial or unless prejudice cannot be avoided or removed by any other means. *Rickett v. Hayes,* 256 Ark. 893, 511 S.W. 2d 187. In this instance the chancellor promptly called the attorneys for the parties into his chambers, advised them what had happened, and stated that he would totally and utterly disregard what he saw as having no bearing on the issues. The matter of granting or denying a mistrial lies within the sound judicial discretion of the trial judge. *Shroeder v. Johnson,* 234 Ark. 443, 352 S.W. 2d 570. We accord much latitude to the trial court and reverse the judgment only if there is an abuse of discretion involving manifest prejudice to the complaining party, i.e., in effect we sustain the trial court unless prejudice affirmatively appears. *Back v. Duncan,* 246 Ark. 494, 438 S.W. 2d 690. We cannot say that there was an abuse of the trial court's discretion in this case.

Many of the facts are undisputed. The property was purchased in June, 1967, from H. A. Taylor and his wife Marie Taylor for a consideration of $10,500, of which $2,000 was paid by E. S. Kennedy. The remainder of $8,500 paid to the Taylors came from the proceeds of a loan made by the McGehee Bank, evidenced by a note for that amount signed by E. S. Kennedy and his brother C. D. Kennedy, dated June 19, 1967, and due in one year with interest at eight per cent per annum. The deed from the Taylors conveyed the property to L. C. Henslee and E. S. Kennedy, as tenants in common. Appellants and appellees joined in the execution of a mortgage on the property dated July 11, 1976, in favor of E. S. Kennedy and C. D. Kennedy to secure the loan. When the note was finally paid on November 24, 1970, the bank delivered it to Mrs. Henslee, who requested that this be done

when someone at the bank called her and asked her what they should do with it. The note was in her possession at the time of the trial. Appellants made the payments necessary to retire this debt, or substantially all of it, by monthly checks or by deposits to the account of E. S. and C. D. Kennedy. They had not repaid all of the $2,000 paid by E. S. Kennedy on the date of the purchase.

These and other facts are gleaned, as far as possible, from the abstract of the record (in which exhibits are identified but not abstracted or reproduced).

The mechanics of the payment of the loan to the bank are not entirely clear. E. S. Kennedy testified that he wrote a check to the bank every month and that Mrs. Henslee would then write a check payable to his order and deposit it in the bank. Appellees introduced 27 checks for $200 each for payments made by the Henslees to the Kennedys. They also introduced seven check stubs showing payments, one check for $211 for interest and nine deposit slips for deposits made to the account of E. S. and C. D. Kennedy. These indicated payments totaling $8,700. Appellants testified that they had paid the $8,500 in full. E. S. Kennedy admitted that they had paid all of this except $100, which he testified they still owe.

L. C. Henslee testified that, when he approached E. S. Kennedy for assistance in financing the purchase of the property, Kennedy was dubious about the property's "paying for itself" and he assured Kennedy that he would pay $200 per month on the loan beginning July 1, 1968, until the loan was paid, and if Henslee could not pay for it, the property would be his (Kennedy's). He said that the bank would not make the loan without E. S. Kennedy's signing the note and E. S. Kennedy told Henslee that C. D. Kennedy would have to sign it, because it was being secured by funds of the Kennedy brothers. The Henslees had no collateral.

L. C. Henslee also testified that he insisted that E. S. Kennedy have "his name put on the deed for security" as had been done on a previous occasion in a similar transaction[2]

---

[2]In this transaction the profits realized from the sale of the property were divided. We cannot tell from the record whether the parties contributed equally to the purchase price or the loan constituted the entire consideration.

and that he (Henslee) had instructed the scrivener accordingly. Henslee testified that he said to E. S. Kennedy at that time, "I trust you," and told Kennedy that, when he paid the money back, Kennedy was to make a quitclaim deed to Henslee. According to Henslee, he still owed E. S. Kennedy $1,038.11 on the $2,000 advanced by Kennedy. Henslee testified that when E. S. Kennedy deeded the property to him he would pay "all that he could rake up that he owed" Kennedy. He said that when E. S. Kennedy came to him in 1974 and said that they should settle the matter, he had, by letter, requested a deed.

Mrs. Henslee testified: that they still owed E. S. Kennedy $2,000; that she had asked him to prepare the papers and that she would pay him; that he had said that he would call her in "a couple of days" but had not done so; and that when the papers were prepared to deed the property to appellants, she would pay him.

E. S. Kennedy testified that the purpose of having his name on the deed was to vest a one-half interest in the property and that he owned one-half of the store. He also testified that he made the $2,000 down payment and that C. D. Kennedy and E. S. Kennedy loaned L. C. Henslee and E. S. Kennedy and their wives $8,500 to pay Taylor. He said that the "note on the store" (apparently the note to the McGehee Bank) was drawn to provide for payments of $200 per month, with interest payable annually. According to him, when the store was purchased, he and Henslee were to be partners and he had intended that his son help operate the store, but the son declined. He said that L. C. Henslee was supposed to get everything the store made until Henslee had paid the $8,500 plus interest and that he (Kennedy) was also to get his $2,000 back plus whatever else he "put in it" ($200 for a walk-in cooler). He said that after these amounts were paid and he had his money back "it was to be fifty-fifty," but that he had not gotten anything out of the store. He said there was no agreement for him to give a deed because he and L. C. Henslee were partners. E. S. Kennedy explained that his name was not on the liquor license because he belonged to the Masonic Lodge and was told that he could not have the license in his name.

In spite of the fact that E. S. Kennedy had not received any of the profits of the store, he loaned L. C. Henslee $500 to make the down payment on a house well after the debt at the bank had been retired. He said the Henslees also owed him $500 Henslee had borrowed to buy hogs. He testified that the Henslees still owed $100 on the $8,500 note, that they had paid only $600 on the $2,000 he paid Taylor and that L. C. Henslee had only paid $800 on loans of $1,000. He had not demanded payment of these sums by Henslee because he said Henslee was trying to pay him. He admitted that a deed had been demanded by Henslee by a letter dated November 5, 1974.

The Henslees operated the store, which was known as Henslee's Grocery & Liquor Store, without aid or advice from Kennedy, and paid all of the taxes on the property. There was no evidence relating to the source of the money the Henslees paid to Kennedy and there is no doubt about E.S. Kennedy's having considered that L. C. Henslee was personally obligated to repay the entire $10,500 purchase price.

Mrs. Henslee testified that $2,000 of the purchase money was obtained by a loan of $2,000 by H. A. Taylor. It is not clear how this relates to the transaction. Although she testified that she had paid all the interest she was supposed to pay Kennedy, the abstract of the record does not disclose any testimony about the amount of interest paid.

The decree of the chancery court stated that appellants sought to prove an oral contract for the conveyance of lands, but dismissed the counterclaim upon the ground that they had failed to prove the contract by clear, cogent and convincing evidence. Both appellants and the trial court seem to have approached this case on the basis that it was an action for specific performance of an oral contract to convey land, and, apparently, that the statute of frauds did not apply because appellants were claiming that their possession of the property and their payments were part performance in which case an oral contract must be proved by clear and convincing evidence. *Pfeifer* v. *Raper*, 253 Ark. 438, 486 S.W. 2d 524; *Reynolds* v. *Havens*, 252 Ark. 408, 479 S.W. 2d 528. But this was erroneous. Appellants have never asserted or relied upon

an oral contract to convey, nor have they ever urged that theory upon the trial court. They have consistently relied upon the theory of an implied trust, and, as pointed out earlier, alleged a resulting trust. In equity, the cause of action and the relief granted are determined by the allegations of fact in the pleading, if there is a prayer for general relief, in the absence of surprise. *Jackson* v. *Jackson,* 253 Ark. 1033, 490 S.W. 2d 809; *Kelly's Heirs* v. *McGuire,* 15 Ark. 555; *Sannoner* v. *Jacobson & Co.,* 47 Ark. 31, 14 S.W. 458. Here there could have been no surprise for the specific prayer for relief was upon the trust theory. Appellants produced evidence in sup- port of that theory, consisting of their own testimony and strongly corroborative circumstances. The chancellor's find- ings against them were not based upon credibility of witnesses. To the contrary he found the evidence to be in complete equipoise. There can be no doubt that appellants have paid nearly all the purchase price for the property. A resulting trust does not depend upon a contract or agree- ment, but may arise in the absence of any agreement at all. It appears that the chancellor considered this case either on the basis that appellants' pleadings asserted a constructive trust as defined in *Kingrey* v. *Wilson,* 227 Ark. 690, 301 S.W. 2d 23, or that he considered it from the view of appellees that appellants sought specific performance of an oral contract. As pointed out, the allegations and evidence were directed toward the theory of a resulting trust.

Ordinarily, we decide an equity case on de novo review, but there are exceptional cases in which we exercise our dis- cretion, in the furtherance of justice, to remand to the chancery court for further proceedings when the trial court has tried the case on the wrong legal theory and where we cannot plainly see what the rights and equities of the parties are. See *Wilson* v. *Rodgers,* 250 Ark. 335, 468 S.W. 2d 739, (opinion on rehearing) 468 S.W. 2d 750; *Wilborn* v. *Elston,* 209 Ark. 670, 191 S.W. 2d 961; *Carmack* v. *Lovett,* 44 Ark. 180; *Long* v. *Charles T. Abeles & Co.,* 77 Ark. 156, 93 S.W. 67. This is such a case, because so much turns on weighing the evidence.

Accordingly, the decree is reversed and the cause remanded for a determination of the issues as to a resulting trust.