Harold RIGSBY *v.* Brett RIGSBY

01-2 57 S.W.3d 206

Supreme Court of Arkansas
Opinion delivered October 25, 2001

*Eddie N. Christian Law Office*, by: *Joe D. Byars*, for appellant.

*Walker, Shock & Cox, P.L.L.C.*, by: *James O. Cox*, for appellee.

DONALD L. CORBIN, Justice. This case involves a dispute over the ownership of real property located in Magazine, Arkansas. Harold Rigsby appeals an order of the Logan County Chancery Court finding that the real property is owned jointly by him and his son Brett Rigsby as partners. For reversal, Harold argues that there was no evidence to support the chancellor's finding of a partnership. This court has jurisdiction pursuant to Ark. Sup. Ct. R. 1-2(a)(7). We reverse that part of the chancellor's order finding that the real property was jointly owned by Harold and Brett as partners.

The record reflects that Harold purchased a parcel of land from R.V. and Mary Huff in August 1971, for $19,500. Initially, Harold and his family lived in a small trailer located on the property. A short time later, Harold purchased a new trailer home where he

lived with Brett until 1984. At that time, Brett suggested to his father that they obtain a bank loan in order to build a new house on the property. The parties then co-signed for a $45,000 loan from Citizens Bank of Booneville. Harold secured the note with a mortgage on the Rigsby Road property. It is undisputed that upon obtaining the loan, Brett agreed to pay the monthly loan payments, while Harold agreed to pay all other bills, including taxes, insurance, maintenance, utilities, and groceries. The parties abided by this agreement until 1997.

On October 27, 1997, Brett filed a complaint in chancery court alleging that he was entitled to an equitable one-half interest in the real property owned by his father. The complaint alleged that Brett had jointly entered into a debt on the property, thereafter making all payments due on the debt, and that he had constructed substantial improvements on the property resulting in an increase in its value. Based on these allegations, Brett asserted that he had acquired a one-half interest in the real property. He requested an order directing partition of the property, to the extent that it could not be divided in kind. Brett further requested that a constructive trust be imposed upon his equitable interest in the proceeds resulting from any sale of the real property. Finally, Brett alleged that he and his father were partners in a cattle operation and that he had primarily cared for the cattle until his father caused all of the cattle to be sold. He requested an accounting of all the proceeds from the sale of the cattle and that he be awarded a one-half interest in those proceeds. Harold, who denied each of Brett's allegations, filed a counterclaim for ejectment. He requested that the chancery court award him sole possession of the property and dismiss Brett's claims against him.

A hearing was held in chancery court on January 13, 1999. While the parties agreed that they originally sought the loan for the purpose of building a new house, there was conflicting testimony regarding the construction of certain improvements on the real property. Brett testified that he made substantial improvements to the land, including clearing parts of the land, fertilizing it, erecting fences, and building a barn. On cross-examination, Brett admitted that he and his father sometimes disagreed about the necessity of those improvements, such as the building of a new barn. He testified that his father tried to dissuade him from tearing down the old barn, and that his father even offered to pay him not to build a new barn. Harold testified that he had no control over his son when it came to his desire to make certain improvements. He also testified that many of the improvements such as the clearing and the pond

were completed by Brett for his benefit. Specifically, Harold stated that his son was an avid hunter and that he cleared parts of the land in order to attract dove, deer, turkeys, and other wild game. According to Harold, he did receive some benefit from these improvements; however, he was not allowed to use the cleared land for his cattle until after hunting season was over.

The parties also gave conflicting testimony with regard to the cattle operation. Brett stated that he and his father ran cattle on the property. On cross-examination, however, Brett admitted that he worked daily at the Whirlpool Corporation from 7:00 a.m. until 3:42 p.m. Brett also stated that he incurred significant expenses in connection with the cattle operation but was not reimbursed for such expenses. Harold testified that he alone ran the cattle operation but admitted that his son helped occasionally, including taking care of the cattle in 1996 while he was hospitalized.

Finally, there was a conflict in the testimony regarding some of the house payments. Brett stated that he had made every house payment since October of 1984. He admitted, however, that his father made a one-time principal payment of $4,000 in October 1992. Harold stated that he also paid three full monthly house payments, as well as one-half of an additional monthly payment. Harold stated further that he incurred expenses totaling $6,230 for improvements made to the house.

After taking the matter under advisement, the chancellor issued a written order finding that the parties had entered into a partnership in 1984 when they agreed to undertake a mutual debt for the purpose of constructing a new house, and that the real property then became property of that partnership. He found further that Harold was entitled to a $12,606.25 credit, should the property ever be sold, to compensate him for his down payment on the property, and the reduction in principal on the original note prior to its satisfaction. Finally, the chancellor awarded the proceeds from the sale of cattle solely to Harold, but inadvertently stated in the decree's final paragraph that those proceeds were to be divided equally between Harold and Brett. An amended decree was filed in which the final paragraph was changed to reflect that Harold was entitled to the proceeds from the sale of the cattle.[1]

---

[1] The chancellor's order regarding the cattle proceeds is not challenged on appeal.

Harold appealed the chancellor's order, but his appeal was dismissed without prejudice because the chancellor failed to address Brett's claim for partition. *See Rigsby v. Rigsby*, 340 Ark. 544, 11 S.W.3d 551 (2000). Upon dismissal, the chancellor conducted a second hearing and made additional findings that were reflected in a revised order. The trial court again found that each party was an equal partner in the ownership of the land, but also found that such ownership extended to all mineral interests. The trial court ordered that the property was to be sold, and that each party was entitled to reserve their respective interest in the mineral rights. The chancellor ordered further that the parties would equally bear all closing costs and expenses related to the public sale of the property, with the remaining proceeds to be divided equally, less the $12,606.25 credit awarded to Harold. Finally, the chancellor found that Harold could remain in possession of the property until it was sold. From that order, comes the instant appeal.

For reversal, Harold argues that the trial court erred in finding that the parties formed a partnership with respect to the real property because there was no evidence to support the existence of a partnership. Specifically, Harold argues that there is no evidence that the parties agreed to carry on a "business for profit" with respect to the real property, or that they ever had the requisite intent to form a partnership. We agree.

■ We review chancery cases *de novo* on the record, but we do not reverse a finding of fact by the chancellor unless it is clearly erroneous. *Stephens v. Arkansas Sch. for the Blind*, 341 Ark. 939, 20 S.W.3d 397 (2000); *Simmons First Bank of Ark. v. Bob Callahan Servs., Inc.*, 340 Ark. 692, 13 S.W.3d 570 (2000). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.*

■ Under Arkansas's Uniform Partnership Act, a partnership is defined as "an association of two (2) or more persons to carry on as *co-owners a business for profit.*" [Ark. Code. Ann.] § 4-42-201(1) (Repl. 1996) (emphasis added). Similarly, this court has defined a partnership as "a voluntary contract between two or more competent persons to place their money, effects, labor, and skill, *or some or all of them*, in lawful commerce or business, with the understanding that there shall be a proportional sharing of the profits and losses between them." *Wymer v. Dedman*, 233 Ark. 854, 859, 350 S.W.2d 169, 172 (1961) (footnote omitted) (quoting *Black's Law Dictionary* (4th ed. 1957)).

■ Although the entity known as a partnership may not always be defined with exact precision, the test for determining the existence of a partnership is well established. *See, e.g., Boeckmann v. Mitchell*, 322 Ark. 198, 909 S.W.2d 308 (1995). In *Gammill v. Gammill*, 256 Ark. 671, 510 S.W.2d 66 (1974), this court stated that the primary test of a partnership between the parties is their actual intent to form and operate a partnership. *See also Brandenburg v. Brandenburg*, 234 Ark. 1117, 356 S.W.2d 625 (1962); *Culley & Sons v. Edwards*, 44 Ark. 423 (1884). The existence of a partnership need be proved only by a preponderance of the evidence. *Gammill*, 256 Ark. 671, 510 S.W.2d 66. Thus, the threshold question to be decided by this court is whether Harold and Brett intended to form and operate a partnership when they agreed to obtain the bank loan in 1984.

Upon reviewing the record in this case, we are convinced that there was no evidence to support a finding that either party intended to form a partnership. In fact, both parties testified that they undertook the joint debt because they simply wanted to build a new house. The following colloquy between Brett and his counsel during direct examination is illustrative of the evidence submitted regarding the parties' view of this transaction:

[COUNSEL]:

Q. You claim an equity in that property out there?

MR. BRETT RIGSBY:

A. Yes, sir.

Q. You put money into it with his knowledge?

A. Correct.

Q. And what was your relationship with him? I think you said earlier that you thought you were partners on the cattle; how about in regards to the real estate?

A. It was my understanding — he told me to do what I wanted to do with it — some day it was all going to be mine anyway.

At best, this evidence reveals that in choosing to undertake a joint debt and make improvements to the property, Brett relied on

his father's promise to one day convey the real property to him. Moreover, the fact that Harold retained sole legal title to the real property contradicts any suggestion that he intended to form a partnership with his son when he agreed to the joint debt and bill-paying arrangement. Likewise, there was no evidence presented to support a finding that the agreement to build the house had any business related purpose.

 In addition to a lack of evidence supporting the existence of a partnership, there were also no facts pled by Brett regarding the existence of a partnership in the building of the house. The only allegation concerning a partnership was Brett's claim that he and his father jointly ran the cattle operation, but the trial court specifically found Harold's testimony on that issue to be more convincing, and found that there was no partnership in the cattle business. As previously pointed out, Brett does not challenge this finding. Based upon a review of the foregoing evidence, we believe that the chancellor erred in finding that the parties formed a partnership in 1984 and that the real property became property of that partnership. Accordingly, we reverse that part of the chancellor's order regarding the ownership of the real property and the respective mineral interests.

 On a final note, we recognize that while normally this court reviews equity cases *de novo* on appeal, it is sometimes necessary to remand a case to the chancery court for a determination of the parties' rights. Such was the case in *Henslee v. Kennedy*, 262 Ark. 198, 555 S.W.2d 937 (1977), where this court stated:

> Ordinarily, we decide an equity case on *de novo* review, but there are exceptional cases in which we exercise our discretion, in the furtherance of justice, to remand to the chancery court for further proceedings when the trial court has tried the case on the wrong legal theory and where we cannot plainly see what the rights and equities of the parties are. This is such a case, because so much turns on weighing the evidence.

*Id.* at 210, 745 S.W.2d at 943 (citations omitted).

Here, the record is replete with contradictory evidence that is highly relevant to a determination of the parties' interests in the real property. Because we recognize that the chancellor is in the best position to weigh the credibility of witnesses and to determine the weight to be accorded their testimony, we remand this case for a determination of what relief, if any, Brett is entitled.

Reversed and remanded.