O.L. LYNCH and Thelma Lynch *v.* Carol BRUNNER

87-258                                            745 S.W.2d 115

Supreme Court of Arkansas
Opinion delivered February 16, 1988

516

*Peel, Eddy and Gibbons*, by: *David L. Eddy*, for appellants.

*Gordon & Gordon, P.A.*, by: *Allen Gordon*, for appellee.

DAVID NEWBERN, Justice. This quiet title action arose from a land ownership dispute. The chancellor decided that neither party had presented sufficient evidence to establish either record title or title by adverse possession to the tract of land in question. He quieted title in the parties equally as tenants in common, "based on the uncertainty of the record title and possession." We hold that there was evidence before the court from which record title to the tract in question could have been determined. Once it was decided that neither party had established title by adverse possession, it was the chancellor's duty to decide which of them had record title, rather than to split the land between them. Therefore, the case is reversed and remanded.

Exhibit "A" to the chancellor's decree is a survey plat of 40 acres, *i.e.*, the SW¼ of the NW¼ of Section 15, Township 9 North, Range 20 West, Pope County, Arkansas, showing four tracts of land, marked 1 through 4, separated by Illinois Bayou water courses and sloughs or purported sloughs. The plat portion of exhibit "A" follows:

Carol Brunner, the appellee, sought to quiet title to land which had been conveyed to her parents, and which her widowed mother had disclaimed in Carol Brunner's favor. The description of the land conveyed in 1940 to her parents, Fay and Bertha Price, and to which Carol Brunner now claims record title, is as follows:

> S½ of the NW¼ (except that part lying between the slough and the main channel of Illinois Bayou, described as beginning at the mouth of the slough at the Southeast corner of said tract and run with the slough along the middle of the bed of the slough in a North and Northeasterly course to the main channel of Illinois Bayou; thence along and with the Bayou in a South and Southeasterly course to middle of the slough to the point of beginning and containing 10.51 acres) containing seventy (70) acres, more or less.

In her complaint, Ms. Brunner alleged that she and her predecessors in title had been in possession and had been paying taxes on the property described since 1940.

The appellants, O. L. and Thelma Lynch, were defendants in Ms. Brunner's quiet title suit. The Lynches claim record title, based on a deed to them in 1951 of the following:

> Part of the SW¼ of the NW¼ of Section 15, Township 9 North, Range 20 West that lies between the slough and middle of main channel of Illinois Bayou, containing 10.57 acres, more or less, described as beginning at the mouth of the slough aforesaid at the SE-corner of said parsel (sic) of land, and run with the meanderings thereof along the middle of the bed of said slough in a Northwesterly direction to the middle of main channel of said Illinois Bayou; thence along the middle of main channel of said Bayou with its meanderings in a Southeasterly direction to the middle of the mouth of said slough, the point of beginning.

In their answer and counterclaim for quiet title, the Lynches alleged they were the owners and in possession of all of that part of the platted 40 acres lying west of the middle of a slough, containing 27.5 acres, more or less. They claimed to have been in exclusive and adverse possession of all property in the platted 40

acres west of "the slough" since 1951.

If, as the parties and the chancellor seemed to assume, both of the deed descriptions referred to the same slough, the question becomes which of the sloughs shown on the plat was intended to be the monument to which the deeds referred. If it was the easternmost slough, then tracts 2 and 3 were excepted from the conveyance to Ms. Brunner's parents and were included in the conveyance to the Lynches. If it was the westernmost slough, *i.e.*, the one virtually in the middle of the platted 40 acres, then tract 3 was not excepted from the conveyance to Ms. Brunner's parents and was not included in the conveyance to the Lynches. The litigation apparently was precipitated by the fact that both parties have leased the mineral rights to their interests. In answer to an interrogatory, it was stated that Ms. Brunner and her predecessors had received $19,705 in royalties. The Lynches claim they are entitled to some or all of that money.

Texas Oil & Gas Corporation and TXO Production Corporation, as well as Chevron Corporation were made parties to the litigation, but Ms. Brunner and the Lynches agreed they would not seek any recovery from those lessees except to the extent the lessees had held royalties in suspension since the filing of the suit, thus the oil and gas companies are not parties to the appeal.

Ms. Brunner's mother, Bertha Price, testified that she and her husband, Fay Price, moved to a farm they owned, generally east of the land in question, in 1937. She testified that they bought the land described in their deed in 1940, and they rented "the island," which she pointed out as tract 2 on the map, from Oscar Harwell. She pointed out the westernmost slough on the map as being "the slough as I knew it," and stated that during the time she was there, it was filled with water in places deep enough to fish. Referring to the easternmost slough on the map, she said it was not a slough, but would be apparent only when the bayou was overly full. The "middle area," she said, was referred to by everyone as "the slough." She said that Mr. Lynch owned 40 acres west of the 40 acres shown on the plat, and that they, the Prices, owned all but the island (tract 2) of the 40 acres shown. She said there was a fence along the middle slough in the 1950s to keep Mr. Lynch's cattle from pasturing on tract 3.

James W. Walters testified that he first leased farm land

from Fay Price in 1974 or 1975, and that he now leases it from Bertha Price. He said tracts 1, 2, and 3 are mostly timber now, and that tract 4 is considerably more elevated. He said Mr. Price originally pointed out the line generally between tracts 2 and 3 as being his property line. Mr. Walters now keeps a fence between tracts 3 and 4 to keep his cattle from going into the lowlands which tend to flood. He said Mr. Price told him he kept a fence there because the ground was higher on tract 4 and a fence could be kept there, implying that fences in the bottom land were easily washed out. Mr. Walters testified further that there is usually water standing in the easternmost slough. He first went on the land in the 1970s and did not know how it looked in 1940.

Jerry Scroggins, County Clerk of Conway County and a livestock farmer, testified he leased the Price land during a period when it was not leased to Mr. Walters. He first leased it in the 1970s and up until 1985 or 1986. He said he kept a fence between tracts 3 and 4 as he did not want his cattle getting into tract 3. He thought of the easternmost slough as just a "back up" for the Illinois Bayou. He testified that it would not have water standing in it when "it got real dry," and that the middle slough had water standing in it from time to time. When asked directly what he would think of if someone spoke of a slough on the property, he responded the area between tracts 2 and 3, but in response to further questioning he could not say whether that area or the other one was "more pronounced."

Ms. Brunner testified that as a child she would go with her father, Mr. Price, to repair fence between tracts 2 and 3, and that to get to that area, they would sometimes drive around on the western side through Mr. Lynch's land. She said her father tired of keeping the fence around tract 3 and then kept his cattle up on tract 4.

James Martin, the surveyor who prepared the plat, testified that he had surveyed the property on several occasions. In his original survey, he did not show the middle slough. When he resurveyed the land, he included the middle slough, but its location had to be "pointed out" to him, and he could not tell where it used to be. He said the eastern slough is much more prominent now.

Mr. Lynch testified that after buying the land, including

tracts 2 and 3, in 1951, he pastured cattle on it. There was never a fence separating tracts 2 and 3, and he kept cattle on it until 1958 when he placed the land in the government soil bank program which required that he no longer use it. He kept it in the soil bank until 1968. He said that when loggers were cutting timber on the Price land, they came to him and wanted his timber too. He and Mr. Price watched them cutting logs off the land in question, and Mr. Price did not object or ask for part of the proceeds. Mr. Lynch testified further that he knew his deed called for 10.57 acres, more or less, and that he knew there was more land than that in the description. He was also aware that his lease to Texas Oil & Gas Corporation called for 10.5 acres, but he had not questioned that fact with the company, nor had he questioned with the county the fact that he paid taxes on only 10.5 acres.

Vance Churchill, County Executive Director of the Agriculture Stabilization Conservation Service, testified that he is a cousin of Bertha Price and was formerly associated in business with O. L. Lynch. He testified that he was on the property in question numerous times when it was in the soil bank and has been familiar with the land most of his life. He said the slough is on the east side, and that, although there was a place where the creek would cut through in wet weather, the area between tracts 2 and 3 was not a slough.

Bill McAlister testified that he operated Mr. Lynch's farm for him in 1953, and that the only slough was the one on the east, and he could remember no fences in the middle of the property. To his knowledge, Fay Price never claimed the land, and he did not see any of Mr. Price's cattle on the land when he was there.

Morris Ray Gibson testified he had been familiar with the property since 1930, and that he and his father began working the bottomland for the Prices in 1938. He said there were low places in the area, but that the only slough was the one at the foot of Mr. Price's field, apparently meaning the western boundary of tract 4. His testimony is difficult to follow in the record because counsel neglected from time to time to assure that gestures toward the plat, which was being used as an exhibit, were made into oral references. It is clear enough, however, that Mr. Gibson referred to the eastern area as the slough, and that as of 1943 it was the only thing "out there" that could be called a slough. He testified

further that the Prices both told him they were renting the bottomland from Mr. Harwell.

William Frank Brunner, Ms. Brunner's husband, testified that he first went on the property shown on the plat in 1954, and that he helped his father-in-law, Fay Price, with his cattle pastured on tracts 2 and 3.

## 1. Record title

The Lynches contend the evidence clearly preponderated in favor of holding that the only slough on the land was the easternmost one shown on the plat, and the chancellor erred by not so holding.

The issue before the chancellor was factual. What was the intent of the grantors who made the deeds to the parties with descriptions dependent upon the location of a slough? The evidence was sufficient with respect to the lay of the land, both at the time of trial and at the time the deeds were made, to have supported a decision either way. The problem is that no decision was made. This court has the power to hear chancery cases de novo, and we say we do not remand chancery cases when the facts have been developed fully in the record before us, as it would be pointless to remand for further evaluation. *Potter* v. *Easley*, 288 Ark. 133, 703 S.W.2d 442 (1986). However, when the situation warrants it, we acknowledge that we have the authority to remand a chancery case. One such situation arises when the decision to be made depends largely upon evaluation of the credibility of the witnesses. In *Henslee* v. *Kennedy*, 262 Ark. 198, 555 S.W.2d 937 (1977), the trial court had tried the case on the wrong theory. The record was well developed, but we remanded, saying:

> Ordinarily, we decide an equity case on de novo review, but there are exceptional cases in which we exercise our discretion, in the furtherance of justice, to remand to the chancery court for further proceedings when the trial court has tried the case on the wrong legal theory and where we cannot plainly see what the rights and equities of the parties are. *See Wilson* v. *Rodgers*, 250 Ark. 335, 468 S.W.2d 739 (opinion on rehearing) 468 S.W.2d 750 [1971]; *Wilborn* v. *Elston*, 209 Ark. 670, 191 S.W.2d

961 [1946]; *Carmack* v. *Lovett*, 44 Ark. 180 [1884]; *Long* v. *Charles T. Abeles & Co.*, 77 Ark. 156, 93 S.W. 67 [1905]. This is such a case, because so much turns on weighing the evidence. [262 Ark. at 210; 555 S.W.2d at 943]

In this case, the chancellor not only viewed the witnesses but also viewed the land in question. He was far better equipped than this court to determine the location of "the slough" described in the deeds. As in *Henslee* v. *Kennedy, supra*, we remand the case because the parties are entitled to a resolution of the issue in the first instance by a judge who has a better vantage point for weighing the evidence.

### 2. Adverse possession

There is no substantial dispute that the Lynches hold record title to tracts 1 and 2, and Ms. Brunner or her predecessors hold record title to tract 4.

The chancellor, upon determining that he could not decide which party had record title to the disputed area, proceeded to consider whether either had demonstrated adverse possession. He held that the Lynches were entitled to tracts 1 and 2 by virtue of adverse possession and that Ms. Brunner had established title to tract 4 by adverse possession. Neither of those holdings has been appealed except to the extent tract 2 may be the subject of the cross-appeal discussed below.

With respect to tract 3, the court stated:

The court finds that neither the plaintiff [n]or counterclaimant [n]or their predecessors in title have exercised continuous control or have ever actually been in exclusive possession of the lands designated as tract 3 on the plat attached hereto. That finding is supported by the court's view of the property which was found to be covered by sand, water, washed rock, and very large trees. Based on the uncertainty of the record title and possession thereof, the court finds that the area described as tract 3 should be quieted in the plaintiff and defendants equally as tenants in common with each party having an undivided one-half interest.

We know of no authority which permits title to be conferred on the basis of uncertainty of record title or a failure on the part of the contestants to establish adverse possession. In the circumstances presented here, given the failure on the part of either party to prove adverse possession of the land in question, the chancellor was relegated to the question of record title, which, as we noted above, was the question which should have been decided. Given Mrs. Price's testimony that the Prices rented tract 2 from Mr. Harwell and apparently did not claim to own it, it is pretty clear Ms. Brunner can make no successful adverse possession claim to tract 2, and we find no fault with the chancellor's determination that neither party has established title to tract 3 by adverse possession. Left for determination is the question of record title to tract 3.

### 3. The royalties

The Lynches argue that they should have been given a share of the mineral royalties paid to Ms. Brunner and her predecessors for mineral interests in tract 2 and tract 3. They claim that their entitlement to half of tract 3 and all of tract 2 dates back at least to 1958, or seven years after their evidence showed they went on the land. Ms. Brunner's response is that there has been no showing as to when any such royalties were received and the court made no determination as to when the Lynchs' possession ripened into title, thus the record does not support a division of the royalties.

We need not decide this issue, as presumably the entitlement to royalties may be affected by the court's decision on the ownership of tract 3.

### 4. Cross-appeal

■ For her cross-appeal Ms. Brunner contends that because she and her predecessors in title have paid taxes on at least portions of tracts 2 and 3, as have the Lynches, for a long period of time, the land should have been divided between them according to the proportion of taxes paid on the tract by each party. This argument was not made to the chancellor, was not supported by records clearly showing that the tax payments were made on the land in question, and is not supported by any cited authority, and thus we will not consider it.

Reversed and remanded.